Robert A. **WRIGHT** and Deeann K. **Wright,** Plaintiffs,

v.

**BROOKE GROUP LIMITED;** Liggett & Myers, Inc.; Liggett Group Inc.; Philip Morris Incorporated (Philip Morris U.S.A.); Philip Morris Companies, Inc.; R.J. Reynolds Tobacco Company; RJR Nabisco, Inc., Defendants.

No. C99–3090.

United States District Court, N.D. Iowa, Central Division.

Sept. 29, 2000.

E. Ralph Walker, David J. Darrell and Harley C. Erbe of Walker Law Firm, Des Moines, IA, for Plaintiff.

Robert A. VanVooren and Thomas Waterman of Lane & Waterman, Davenport, IA, Timothy E. Congrove and Patrick Sullivan of Shook, Hardy & Bacon, L.L.P., Kansas City, MO, for Defendant Philip Morris, Inc.

Richard R. Chabot of Sullivan & Ward, P.C., Des Moines, IA, for Defendants The Brooke Group, Ltd., Liggett & Myers, Inc., and Liggett Group Inc.

Steven L. Nelson, of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, IA, and Todd Kennard of Jones, Day, Reavis & Pogue, Cleveland, OH, for Defendant R.J. Reynolds Tobacco Co.

## MEMORANDUM OPINION AND ORDER REGARDING CERTAIN DEFENDANTS' MOTION TO DISMISS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................... 803

II. STANDARDS FOR MOTION TO DISMISS .................................. 804

III. LEGAL ANALYSIS ................................................... 805
 A. Negligence and Strict Liability Claims ............................. 805
 1. Design defect claims .......................................... 805
 a. What test is used in Iowa to determine whether or not a product is unreasonably dangerous? ........................... 806
 b. Does Comment i of § 402A of the Restatement (Second) of Torts bar Mr. Wright's design defect claims? .................. 809
 c. The "common knowledge" doctrine ............................ 810
 d. Is the risk of addiction a "lesser included risk" of the risks of smoking? ................................................. 812
 e. Will the court take judicial notice that the risks of smoking are "common knowledge?" ................................... 815
 2. Failure to warn claims ........................................ 818

B. Express Warranty, Fraudulent Misrepresentation and Fraudulent Nondisclosure Claims ...........................................819
 1. Does the common knowledge doctrine bar Mr. Wright's fraudulent misrepresentation and fraudulent nondisclosure claims? ............819
 2. Does the common knowledge doctrine bar Mr. Wright's express warranty claim? ........................................822
C. Federal Preemption ......................................................822
 1. Does the Labeling Act preempt Mr. Wright's post–1969 fraudulent nondisclosure and failure to warn claims? .........................825
 a. Fraudulent nondisclosure claim ................................825
 b. Failure to warn claim ........................................826
D. Manufacturing defect claim ...........................................827
E. Claim for Breach of Implied or Express Warranties......................828
 1. Implied warranty of merchantability ...........................828
 2. Express warranty claim .......................................828
 3. Does Mr. Wright's failure to notify defendants of the alleged breach of warranty preclude his warranty claims? ..................829
F. Claim for Breach of Special Assumed Duty .............................830
G. Fraud Claims ..........................................................832
 1. Mr. Wright's fraudulent misrepresentation claim ...............833
 2. Mr. Wright's fraudulent nondisclosure claims ..................834
H. Civil Conspiracy Claim and Loss of Consortium Claim..................835
 1. Mr. Wright's civil conspiracy claim............................836
 2. Mrs. Wright's loss of consortium claim.........................838

IV. CONCLUSION ...........................................................838

Over 23 centuries ago, Aristotle wrote: "Thus every action must be due to one or other of seven causes: chance, nature, compulsion, habit, reasoning, anger, or appetite." ARISTOTLE'S RHETORIC, Bk. I, ch. 10. The ultimate resolution of the rising tide of tobacco litigation may some day prove the wisdom of Aristotle's observation. However, this Motion to Dismiss presents initial vexing legal questions that must be resolved by interpreting more mundane issues of Iowa law on the lengthy journey to that final resolution.

## I. INTRODUCTION

On October 29, 1999, Robert A. Wright ("Mr. Wright") and DeeAnn K. Wright ("Mrs. Wright") filed a petition in state court, alleging that they have been damaged as a result of Mr. Wright's cigarette smoking. Mr. Wright alleges that he has developed cancer, as well as suffering from other personal injuries, and Mrs. Wright alleges loss of consortium because of Mr. Wright's alleged injuries. Plaintiffs' complaint contains the following nine counts: (1) Negligence; (2) Strict Liability; (3) Breach of Implied Warranty; (4) Breach of Express Warranty; (5) Breach of Special Assumed Duty; (6) Fraudulent Misrepresentation; (7) Fraudulent Nondisclosure; (8) Civil Conspiracy; and (9) Loss of Consortium. On November 26, 1999, defendants removed this case to federal court based on diversity jurisdiction. *See* 28 U.S.C. § 1441.[1]

Thereafter, on January 21, 2000, certain defendants,[2] Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brooke Group Ltd., Liggett & Myers, Inc. and Liggett Group Inc.,[3] filed a Motion to Dis-

---

1. Because this case is before the court based on diversity jurisdiction, it is controlled by Iowa law. *First Bank of Marietta v. Hogge*, 161 F.3d 506, 510 (8th Cir.1998); *Frideres v. Schiltz*, 113 F.3d 897, 898 (8th Cir.1997).

2. The court dismissed defendant R.J.R. Nabisco, Inc. on February 12, 2000, from this action without prejudice pursuant to a Joint and Stipulated Motion. Thereafter, on April 12, 2000, the court also dismissed from this ac-

tion without prejudice defendant Philip Morris Companies, Inc. pursuant to a Joint and Stipulated Motion.

3. On January 26, 2000, defendants Brooke Group Ltd., Liggett & Myers, Inc., and Liggett Group Inc. joined in all statements, arguments, and defenses asserted by defendants Philip Morris Inc. and R.J. Reynolds Tobacco Company in their Motion to Dismiss and the accompanying Memorandum in Support of

miss plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants[4] assert that all nine of the plaintiffs claims fail as a matter of law because of the following reasons. First, defendants assert that common knowledge of the risks of cigarette smoking bars Mr. Wright's negligence and strict liability design defect and failure to warn claims (Counts I and II) because cigarettes are not unreasonably dangerous under Iowa law and defendants contend they had no duty to warn Mr. Wright of commonly known risks. Second, defendants assert that Mr. Wright's express warranty, fraudulent misrepresentation, and fraudulent nondisclosure claims (Counts IV, VI, and VII) are barred because Mr. Wright could not have justifiably relied on any statements or nondisclosures of defendants in light of the common knowledge of the risks of cigarette smoking and express warnings on cigarette packages and cigarette advertisements. Third, defendants assert that to the extent that Mr. Wright's negligence and strict liability failure to warn and fraudulent nondisclosure claims (Counts I, II, and VII) are based on alleged actions or omissions occurring after 1969, they are preempted by the Federal Cigarette Labeling and Advertising Act (the "Labeling Act"). Fourth, defendants assert that Mr. Wright fails to state a claim that there was a negligent manufacturing defect (Count I), and that there was a breach of implied or express warranties (Counts II and IV), or that there was a breach of special assumed duty (Count V). Fifth, defendants assert that Mr. Wright's fraudulent misrepresentation and fraudulent nondisclosure claims (Counts VI and VII) are not pleaded in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. Sixth, defendants assert that Mr. Wright's civil conspiracy claim (Count VIII) and Mrs. Wright's consortium claim (Count IX)

fail, because Mr. Wright's substantive claims fail.

On February 3, 2000, plaintiffs filed a stipulated Motion for Extension of Time, which this court granted, allowing plaintiffs to and including March 15, 2000, in which to file their resistance. Plaintiffs complied, filing their resistance on March 15, 2000, and asking this court to deny, in its entirety, defendants' Motion to Dismiss. Defendants, thereafter, filed a reply, to which the plaintiffs, after seeking permission from this court, filed a surreply.

On July 19, 2000, the court heard oral arguments on defendants' Motion to Dismiss. Plaintiffs were represented by E. Ralph Walker, David J. Darrell and Harley C. Erbe of Walker Law Firm, Des Moines, Iowa. Defendant Philip Morris, Inc., was represented by Robert A. VanVooren and Thomas Waterman of Lane & Waterman, Davenport, Iowa, and Timothy E. Congrove and J. Patrick Sullivan of Shook, Hardy & Bacon, L.L.P., Kansas City, Mo. Defendants The Brooke Group, Ltd., Liggett & Myers, Inc., and Liggett Group Inc. were represented by Richard R. Chabot of Sullivan & Ward, P.C., Des Moines, Iowa. Defendant R.J. Reynolds Tobacco Co., was represented by Steven L. Nelson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, Iowa, and J. Todd Kennard of Jones, Day, Reavis & Pogue, Cleveland, Ohio.

## II. STANDARDS FOR MOTION TO DISMISS

The issue on a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence in support of his or her claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United*

---

their Motion to Dismiss filed herein on January 24, 2000.

**4.** Rather than referring to "certain defendants" throughout this opinion, the court will

refer to them simply as "defendants." Additionally, the court refers to the plaintiffs in all three of the following ways throughout this opinion: Mr. Wright, Mrs. Wright and plaintiffs.

*States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373, 1376 (8th Cir.1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Gross v. Weber,* 186 F.3d 1089, 1090 (8th Cir.1999) ("On a motion to dismiss, we review the district court's decision *de novo,* accepting all the factual allegations of the complaint as true and construing them in the light most favorable to [the non-movant]."); *St. Croix Waterway Ass'n v. Meyer,* 178 F.3d 515, 519 (8th Cir.1999) ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon v. Hansen,* 168 F.3d 1109, 1113 (8th Cir.1999) (same); *Midwestern Machinery, Inc., v. Northwest Airlines,* 167 F.3d 439, 441 (8th Cir.1999) (same); *Duffy v. Landberg,* 133 F.3d 1120, 1122 (8th Cir.) (same), *cert. denied,* 525 U.S. 821, 119 S.Ct. 62, 142 L.Ed.2d 49 (1998).

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *accord Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) (internal quotation marks and ellipses omitted).

The court will now turn to defendants' Motion to Dismiss with these standards in mind.

## III. LEGAL ANALYSIS

### A. Negligence and Strict Liability Claims

Plaintiffs' pleading essentially alleges that defendants' cigarettes were unreasonably dangerous and caused the plaintiff, Mr. Wright, "to become addicted to tobacco products, including but not limited to Defendants' tobacco products, and to suffer adverse health effects arising from the use of these products," including cancer of the right tonsil, severe emphysema, chronic obstructive pulmonary disease, and permanent cellular damage. *See* Plaintiffs' Complaint ¶ 4.13, ¶ 5.5 and ¶ 6.3. Mr. Wright asserts that the alleged unreasonable dangerousness of defendants' cigarettes is caused by all three types of defects: design, manufacturing and failure to warn.

### 1. Design defect claims

 In adopting strict liability for defective products, codified at § 402A of the Restatement (Second) Torts, the Supreme Court of Iowa specifically recognized that this theory did not replace claims based on negligence. *Lovick v. Wil–Rich,* 588 N.W.2d 688, 698 (Iowa 1999) (citing *Hawkeye–Security Ins. Co. v. Ford Motor Co.,* 174 N.W.2d 672, 685 (Iowa 1970)). Indeed, courts in Iowa have consistently recognized a distinction between the two theories. *Aller v. Rodgers Mach. Mfg. Co.,* 268 N.W.2d 830, 835 (Iowa 1978). Strict liability claims focus on the condition of the product, while negligence claims focus on the conduct of the defendant. *Id.; Chown v. USM Corp.,* 297 N.W.2d 218, 220 (Iowa 1980). Under a theory of strict liability, the plaintiff must establish that the product was in a defective condition and unreasonably dangerous to the consumer. *Chown,* 297 N.W.2d at 220. Under a negligence theory, the plaintiff must establish that the product was unreasonably danger-

ous because the manufacturer failed to use reasonable care. *Ackerman v. American Cyanamid Co.*, 586 N.W.2d 208, 220 (Iowa 1998) (citing *Chown*, 297 N.W.2d at 220).

However, the Iowa Supreme Court has held that despite the distinctions between the two theories of liability, the "unreasonably dangerous" element of a negligent design claim is the same as the "unreasonably dangerous" element of a strict liability design claim. *See id.; accord Hillrichs v. Avco Corp.*, 478 N.W.2d 70, 75–76 & n. 2 (Iowa 1991) (noting in that case "the strict liability claim depend[s] on virtually the same elements of proof as are required to establish the negligence claim" and making the further observation that "a growing number of courts and commentators have found that, in cases in which the plaintiff's injury is caused by an alleged defect in the design of a product, there is no practical difference between theories of negligence and strict liability"); *accord Chown v. USM Corp.*, 297 N.W.2d 218, 220 (Iowa 1980) (stating that proof of unreasonable danger is an essential element under both theories of negligence and strict liability). In deciding whether the evidence supports a finding that a product was "unreasonably dangerous," courts in Iowa apply the principles set forth in Comment i of § 402A of the Restatement (Second) of Torts. *Ackerman*, 586 N.W.2d at 220 (citing *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 916 (Iowa 1990)) (quoting definition of "unreasonably dangerous" from § 402A Comment i, at 352 of Restatement (Second) of Torts (1965)); *Maguire v. Pabst Brewing Co.*, 387 N.W.2d 565, 569–70 (Iowa 1986). Comment i of § 402A, in pertinent part, states:

> "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Restatement (Second) of Torts § 402A cmt. i (1965). Comment i is commonly referred to as the consumer contemplation test.

In this case, defendants assert that the *Maguire* case makes it abundantly clear that, under both negligence and strict liability theories, only the consumer contemplation test is applied in determining whether a product is unreasonably dangerous. Plaintiffs, however, disagree, contending that not only is the consumer contemplation test applied in determining whether a product is unreasonably dangerous, but that the risk-utility test is also applied in determining whether a product is unreasonably dangerous. Thus, while it is clear that Iowa law utilizes the consumer contemplation test to determine if a product is unreasonably dangerous, whether this is the only test used to determine if a product is unreasonably dangerous under Iowa law is not so clear.

### a. What test is used in Iowa to determine whether or not a product is unreasonably dangerous?

In *Aller v. Rodgers Mach. Mfg. Co.*, 268 N.W.2d 830 (Iowa 1978), the Iowa Supreme Court first considered in detail the appropriate standard for a design defect analysis. The plaintiff in *Aller* alleged that a power saw was defectively designed because it did not have an adequate guard system and could be activated when a person's hand was too near the blade. *Id.* at 832. The case went to the jury solely on the theory of strict liability. The jury returned a verdict for the defendant manufacturer and the plaintiff appealed, requesting that the court eliminate the phrase "unreasonably dangerous" from the strict liability test, or at a minimum, change its definition. *Id.* at 835. In ruling on this appeal, the Supreme Court of Iowa explained how the proper test for the strict liability standard was to be applied. In doing so, however, the *Aller* court vacillated between the consumer contemplation test and risk-utility test, and significantly failed to indicate which test was proper in determining whether a product is "unreasonably dangerous" under a strict liability claim. The *Aller* court initially explained that a plaintiff had to establish that the

product was more dangerous than a reasonable consumer would have expected. *Id.* at 834. Thus, this explanation ostensibly adheres to the contemplation test outlined in Comment i of § 402A Restatement (Second) of Torts. Shortly thereafter, however, the *Aller* court explained that in determining whether the product is dangerous to an unreasonable extent requires a balancing of the product's risk and utility:

> Whether the doctrine of negligence or strict liability is being used to impose liability the same process is going on in each instance, i.e., weighing the utility of the article against the risk of its use. Therefore, the same language and concepts of reasonableness are used by courts for the determination of unreasonable danger in product liability cases.

*Id.* at 835. The *Aller* court stated that "this balancing process is the same as that used in negligence cases." *Id.*

Thereafter, the Iowa Supreme Court, in *Chown v. USM Corp.,* 297 N.W.2d 218 (Iowa 1980), displayed the same ambivalence concerning which test is used to determine when a product is "unreasonably dangerous." In that case, the plaintiff claimed the absence of a barrier guard made the machine at issue defective as a matter of both negligence and strict liability. *Chown,* 297 N.W.2d 218 at 220. The trial court found in favor of the manufacturer, concluding that, as a matter of law, the product at issue was not "unreasonably dangerous" and "defective." The plaintiff appealed. In affirming the trial court, the Iowa Supreme Court, explicitly referencing the *Aller* decision, indicated that there are two tests used to determine whether a product is unreasonably dangerous. *Id.* at 220. The *Chown* court explained that one test is whether the danger is greater than an ordinary consumer with knowledge of the product's characteristics would expect it to be; another test is whether the danger outweighs the utility of the product, explaining:

> In a design case, the risk-utility analysis involves balancing the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

*Id.* at 220 (internal citation marks omitted). The *Chown* court, like its predecessor, failed to indicate whether there was a single proper test, and instead applied both tests:

> "Under this record, we cannot say the trial court was compelled as a matter of law to find the calender [machine] was unreasonably dangerous. The court was not required to find that the defendant in 1900–1904 could reasonably have foreseen that a consumer in 1975 would expect barrier guards to be included in the design.... Furthermore, employing the risk-utility analysis, the court was not compelled to find that the safety device was technologically and practically feasible at the time of the manufacture."

*Chown,* 297 N.W.2d at 221.

Similarly, in *Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911 (Iowa 1990), a case that involved a strict liability design defect claim, the Iowa Supreme Court articulated and applied both the consumer contemplation test and the risk-utility test to determine whether the product at issue was unreasonably dangerous. In so holding, the *Fell* court stated "in line with what we said in *Aller,*" that the expert's report generated several fact questions as to whether the elevator, the product at issue, was unreasonably dangerous based on both the consumer contemplation test and the risk-utility test. *Fell,* 457 N.W.2d 911 at 918. With respect to the consumer contemplation test the *Fell* court stated "that a normal user would not appreciate the danger posed by the missing gear guard when operating the shifter lever from the ground." *Id.* With respect to the risk-utility test the *Fell* court stated that "a fact question existed whether the risks

in using such a product outweighed the utility of the product." *Id.*

Moreover, in *Lovick v. Wil–Rich,* 588 N.W.2d 688 (Iowa 1999), the plaintiff instituted a strict liability and negligence action for defective design of a cultivator against the manufacturer. In submitting the design defect claim to the jury, the trial court instructed only on a strict liability theory. The manufacturer appealed the adverse verdict, claiming that the consumer contemplation instruction under the strict liability theory was an unfair standard for manufacturers and that the risk-utility analysis under the negligence theory should have been utilized. On appeal, the *Lovick* court refused to merge the two theories, instead preserving the distinction between the two theories, namely that strict liability focuses on the condition of the product, while negligence focuses on the conduct of the defendant. *Id.* at 698–99. However, the *Lovick* court found no legal error in the trial court's instruction. Specifically, the *Lovick* court stated:

> First, the trial court did not instruct on both negligence and strict liability theories. It only instructed on strict liability. The instruction to the jury included the risk-utility balancing analysis utilized in negligence. Thus, even if strict liability actually applied negligence principles, no prejudice occurred.

*Id.* at 699. The *Lovick* case follows *Aller, Chown,* and *Fell,* in applying both the consumer contemplation test and the risk-utility test in strict liability and negligent design defect claims. Indeed, even though the trial court instructed only on a strict

liability claim, the *Lovick* court found that no error occurred due to the trial court's failure to submit a separate instruction for negligence because the strict liability instruction included the risk-utility test "utilized in negligence". *Id.*

■ This court notes that although the court in *Maguire v. Pabst Brewing Co.,* 387 N.W.2d 565 (Iowa 1986), the case upon which defendants principally rely for their argument, only utilized the consumer contemplation test to determine whether or not the product at issue was "unreasonably dangerous," this test is only one of two tests that have been utilized by Iowa courts. Certainly, the holding in *Maguire* did not foreclose the idea of applying two tests, and based on the cases examined above, admittedly not a model of clarity, the court concludes that under Iowa law, both the consumer contemplation test and the risk-utility test are used to determine whether or not a product is "unreasonably dangerous." [5] This is true for design defect claims brought under a theory of strict liability and a theory of negligence. In the alternative, defendants, in a footnote of their reply brief, argue that the risk-utility test should not be applied to Mr. Wright's design defect claims because the risk-utility test does not apply to products whose potential risks are well-known such as cigarettes. For this proposition defendants rely on *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1409, 1412 (7th Cir.1994) and *Filkin v. Brown & Williamson Tobacco Corp.,* No. 99 C238, 1999 WL 617841, at *1 (N.D.Ill. Aug. 11, 1999). This argument, however, presupposes that the risks asso-

---

5. Iowa Civil Jury Instruction 1000.5 provides the following:

Unreasonably Dangerous—Definition. A defective product is unreasonably dangerous if:
1. The danger is greater than an ordinary consumer with knowledge of the product's characteristics would expect it to be.
2. The danger outweighs the utility of the product.
3. The benefits of the design do not outweigh the risks. In determining whether the design benefits outweigh the risks, you may consider:

a. The seriousness of the harm posed by the design.
b. The likelihood that such danger would occur.
c. The mechanical feasibility of a safer alternate design.
d. The costs of an improved design.
e. The adverse consequences to the product and the user that would result from an alternate design.
f. Any other facts or circumstances shown by evidence having any bearing on the question.

ciated with smoking cigarettes, including addiction, are well-known and that this court will take judicial notice of this fact. Therefore, before determining whether or not the risk-utility test, in addition to the consumer contemplation test, is applicable here, the court must venture forth to determine whether it will take judicial notice that the risks associated with smoking cigarettes, including addiction, are, in fact, common knowledge. Initially, however, the court will first address defendants' argument that Comment i of § 402A of the Restatement (Second) of Torts bars Mr. Wright's design defect claims.

### b. Does Comment i of § 402A of the Restatement (Second) of Torts bar Mr. Wright's design defect claims?

According to the defendants, because the plain language of Comment i makes it clear that cigarettes are not unreasonably dangerous, Mr. Wright cannot properly state a claim for design defect with respect to the cigarettes he allegedly smoked. Defendants point out that tobacco is explicitly held out as an example of a product that is not unreasonably dangerous in § 402A and Comment i:

> Many products cannot be made safe for all consumption, and any food or drug necessarily involves some risk of harm ... That is not what is meant by unreasonably dangerous in this section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whisky, containing a dangerous amount of fuel oil, is unreasonably dangerous. *Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.*

Restatement (Second) of Torts § 402A, cmt. i (emphasis added). Based on the

plain language of this comment, therefore, defendants argue that because tobacco is not unreasonably dangerous, an essential element under Mr. Wright's negligence and strict liability design defect claims, such claims fail as a matter of law.

Additionally, in their reply brief, defendants argue that the distinction asserted by the plaintiffs between "good tobacco," as listed in Comment i, and manufactured cigarettes is without merit. This is so, because defendants contend that Comment e of § 402A specifically contemplates § 402A's application to manufactured products:

> Normally, the rule stated in this Section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing.

Restatement (Second) of Torts § 402A, cmt. e. Thus, defendants assert that in addition to Comment e, the plain language of Comment i, as well as its historical context and "legislative history," make it clear that the framers of § 402A meant to exempt manufactured cigarettes as a definitional example of a non-defective product. Defendants' Reply Brief at 4. The court rejects this argument.

Initially, defendants are correct that Iowa has adopted Comment i of § 402A. However, this court finds that even so, plaintiffs' claims would not necessarily be barred. Indeed, while not binding on this court, many courts that have addressed this same argument have concluded that, because cigarettes are manufactured products and not raw tobacco, Comment i "does not, as a matter of law, remove all claims of defective tobacco products from the operation of Section 402A." *Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1522 (D.Kan.1995) (noting that although "good tobacco," without any additives or foreign substances, may not be unreasonably dangerous, that does not automatically mean that all tobacco-containing products are not unreason-

ably dangerous); *See also Witherspoon v. Philip Morris Inc.,* 964 F.Supp. 455, 466 (D.D.C.1997) (citing *Burton* ); *Tompkins v. R.J. Reynolds Tobacco Co.,* 92 F.Supp.2d 70, 85 n. 9 (N.D.N.Y.2000) (noting that R.J. Reynolds' reliance on Comment i of § 402A to show that cigarettes are not unreasonably dangerous when manufactured according to plan is not New York law and therefore unavailing); *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1053 n. 8 (Ind.Ct.App.1990) (noting that because cigarettes are manufactured products and not raw tobacco, Comment i does not, as a matter of law, remove all claims of defective tobacco products from the operation of § 402A). For example, in *Hill v. R.J. Reynolds Tobacco Co.,* 44 F.Supp.2d 837 (W.D.Ky. 1999), the district court explained that design defect claims that allege the deliberate addition of harmful substances beyond those naturally occurring in tobacco disqualify cigarettes as "good tobacco" and thus "would allow a finding that they are defective and unreasonably dangerous." *Id.* at 852–53.

This court points out that no Iowa court has concluded that cigarettes are not an unreasonably dangerous product, as a matter of law, based on Comment i of § 402A. The court is mindful that this tobacco case is one of first impression in the State of Iowa, and, thus, to a large extent, is the reason that this part of Comment i dealing with tobacco has never been mentioned in any Iowa case. However, even the majority of cases that have dismissed cigarette product liability claims have done so not based on Comment i, but after a thorough analysis of the specific risks claimed by the respective plaintiff to have caused his or her injury and whether those risks were "common knowledge" during the relevant time period. *See Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 273 (D.R.I.2000) (refusing to blindly apply Comment i to bar plaintiff's claims); *Hollar v. Philip Morris Inc.,* 43 F.Supp.2d 794, 806–07 (N.D.Ohio 1998); *Paugh v. R.J. Reynolds Tobacco Co.,* 834 F.Supp. 228, 230–31 (N.D.Ohio 1993). *But see Es-*

*tate of Edward D. White v. R.J. Reynolds Tobacco Co.,* 2000 WL 1133537, *6 ("The insurmountable obstacle to recovery on plaintiffs' strict liability claim is comment i to § 402A, known as the consumer expectation test."). In a similar vein, this court, refuses to dismiss Mr. Wright's design defect claim solely on the basis of the language contained in Comment i of § 402A of Restatement (Second) of Torts. *See Insolia v. Philip Morris Inc.,* 216 F.3d 596, 603 (7th Cir.2000) (stating that "we explicitly reject the tobacco industry's invitation to declare that cigarettes are not unreasonably dangerous."). Thus, defendants' motion to dismiss Mr. Wright's strict liability and negligence design defect claims based solely on Comment i § 402A of the Restatement (Second) of Torts is denied.

### c. The "common knowledge" doctrine

In the alternative, defendants argue that even if the plain language of Comment i § 402A of the Restatement (Second) of Torts does not persuade this court that cigarettes are not unreasonably dangerous, the common knowledge doctrine completely defeats Mr. Wright's design defect claims. The common knowledge doctrine rests upon the premise that a product is not unreasonably dangerous if everyone knows of its inherent dangers. Comment i of § 402A of the Restatement of (Second) of Torts incorporates the common knowledge doctrine. Comment i, which describes the term "unreasonably dangerous," states: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A cmt. i (1965).

According to defendants, both state and federal courts throughout the country have applied the laws of the states in which they sit and repeatedly dismissed claims brought by cigarette smokers because information regarding the risks of smoking,

including addiction, have long been available to, and known by, the public. *See e.g. Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir.1988); *Filkin v. Brown & Williamson Tobacco Corp.,* 1999 WL 617841, *1 (N.D.Ill. Aug.11, 1999); *Paugh v. R.J. Reynolds Tobacco Co.,* 834 F.Supp. 228, 230–31 (N.D.Ohio 1993); *Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1158 (E.D.Pa.1987); *Tune v. Philip Morris,* No. 97–4678–CI, at 6 n. 4 (6th Jud.Cir.Ct., Pinellas County Fla. Feb. 10, 1999). Thus, defendants argue here, that because the health risks of smoking, including the possibility of addiction, are and have been common knowledge in the State of Iowa, as a matter of law, cigarettes cannot be found to be unreasonably dangerous.

Whether the common knowledge doctrine defeats plaintiffs' design defect claims based on both strict liability and negligence, as a matter of law, is a novel question in Iowa. Other courts considering this very issue have reached different results regarding when, if at all, assorted risks, namely general disease-related risks and risks of addiction, associated with smoking became common knowledge. In *Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263 (D.R.I.2000), the district court noted that the "Northern District of Ohio, applying Ohio law, has been particularly active in dismissing smokers' claims under Rule 12(b)(6) based on the common knowledge of health risks associated with smoking since at least 1966 and as far back as 1940." *Id.* at 270. *See e.g. Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 2000 WL 1229061, * 7 (6th Cir. Aug.31, 2000) (affirming district court's dismissal of plaintiff's wrongful death claims against the defendant tobacco companies pursuant to FED.R.CIV.P. 12(b)(6) because the common knowledge doctrine barred her claims during the relevant time period when plaintiff began to smoke, 1969, until the time plaintiff ceased to smoke, 1997); *Hollar v. Philip Morris Inc.,* 43 F.Supp.2d 794, 807 (N.D.Ohio 1998) (dismissing two plaintiffs' product liability claims, who began smoking in 1968 and 1971 respectively,

because "[t]he case law is well settled that the health hazards of smoking were within the ordinary citizen's common knowledge at that time"); *Paugh v. R.J. Reynolds Tobacco Co.,* 834 F.Supp. 228, 230–31 (N.D.Ohio 1993) (dismissing claims of plaintiff who smoked from 1940–1990 because "the dangers posed by tobacco smoking have long been within the ordinary knowledge common to the community"). After observing this fact, the district court in *Guilbeault* concluded:

> [A]fter thoroughly reviewing the facts regarding the evolution of the public's knowledge of smoking-related dangers, the Court is satisfied that it can take judicial notice of the community's common knowledge of the general disease-related health risks associated with smoking, including the risk of contracting cancer, as of 1964.

*Guilbeault,* 84 F.Supp.2d at 273.

Moreover, several courts have granted summary judgment to the defendant tobacco companies because the risks associated with smoking were common knowledge. *See Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 172 (5th Cir.), *cert. denied,* 519 U.S. 930, 117 S.Ct. 300, 136 L.Ed.2d 218 (1996) (applying Texas law) (affirming grant of summary judgment to defendant on "lifetime smoker's" failure to warn claim for failure to comply with statute of limitation, and alternatively under "common knowledge" theory, as "the dangers of cigarette smoking have long been known to the community") (citing *Roysdon* and *Paugh );* *Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir. 1988) (applying Tennessee law) (applying common knowledge doctrine to affirm grant of summary judgment to defendant on plaintiff's product liability claims spanning 1974–1984, citing with approval the district court's observation that " 'tobacco has been used for over 400 years.... Knowledge that cigarette smoking is harmful to health is widespread and can be considered part of the

common knowledge of the community.'");
*The American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 429–31 (Tex.1997) (applying Texas law) (granting summary judgment to defendant on claims based on failure to warn of health risks of smoking since 1952 because the general ill-effects of smoking were common knowledge at that time).

Courts in other jurisdictions, however, have refused to dismiss claims based on the common knowledge doctrine. *See Tompkins*, 92 F.Supp.2d at 87 (refraining from taking judicial notice that the risks of cigarette smoking have been "open and obvious" to consumers since plaintiff began smoking in 1938 because such an issue involves questions of fact); *Hill v. R.J. Reynolds Tobacco Co.*, 44 F.Supp.2d 837, 844 (W.D.Ky.1999). The district court in *Hill* observed:

> [T]he judicial notice inquiry [in this case] would focus on the state of popular consciousness concerning cigarettes before 1969. The Court is simply unwilling to take judicial notice of something as intangible as public knowledge over three decades in the past. The exercise seems inherently speculative and an inappropriate topic for judicial notice.

*Hill*, 44 F.Supp.2d at 844. As demonstrated, these above-mentioned cases focus the common knowledge inquiry on whether the link between cigarette smoking and general health risks was common knowledge during the relevant time period. Other cases that have analyzed the common knowledge inquiry have distinguished between knowing about the general health risks of smoking and knowing about the risk of addiction, or other specific illnesses or injury allegedly caused by defendants' tobacco products. In this case, defendants contend that the risk of addiction is a "lesser included risk" of the general risks of smoking.

### d. Is the risk of addiction a "lesser included risk" of the risks of smoking?

Several courts have said that whether or not there is a distinction between knowing about the general risks of smoking and knowing about the risk of addiction is a question of fact that should be decided by the jury. *See State of Texas v. American Tobacco Co.*, 14 F.Supp.2d 956, 966 (E.D.Tex.1997) (when facts are viewed in light most favorable to plaintiff, "while the health risks of tobacco consumption are generally known, the addictive nature of tobacco consumption is not generally known due to the concealment and misrepresentation by Defendant"); *Castano v. American Tobacco Co.*, 961 F.Supp. 953, 958 n. 1, 959 (E.D.La.1997); *Grinnell*, 951 S.W.2d. at 429–31 (refusing to grant summary judgment on failure to warn of the addictive nature of cigarettes because "we cannot simply assume that common knowledge of the general health risks of tobacco use naturally includes common knowledge of tobacco's addictive quality") [6]; *Burton v. R.J. Reynolds Tobacco Co.*, 884 F.Supp. 1515, 1525–26 (D.Kan.1995). In *Burton*, the district court refused to find as a matter of law that the dangers of smoking have been common knowledge since the 1950's. *See Burton*, 884 F.Supp. at 1526. The *Burton* court, quoting a state court decision, noted that:

> "[t]here is no basis for our judicially noticing what the ordinary consumer's knowledge concerning the addictive qualities of cigarettes may have been

6. The court's holding in *Grinnell* regarding the addictive nature of cigarettes has been superseded by statute as stated by the Fifth Circuit Court of Appeals in *Sanchez v. Liggett & Myers, Inc.*, 187 F.3d 486, 490 (5th Cir. 1999). In 1993, after the lawsuit in *Grinnell* was filed, the Texas legislature codified Comment i to § 402A of the Restatement (Second) of Torts to preclude product liability actions based on cigarettes. *See id.* at 489. The *Sanchez* court concluded that the statute superseded the *Grinnell* court's holding regarding the addictive nature of cigarettes because the plain language of the statute and its legislative history established that the Texas legislature did not intend to distinguish between general health dangers and addictive dangers of smoking when assessing "common knowledge." *See id.* at 490.

when [plaintiff] began smoking in 1940. The state of knowledge attributable to the community of individuals consuming cigarettes has changed over time and will continue to do so. It was not until 1988 that the Surgeon General published a report informing of the addictive nature of cigarettes."

*Id.* (quoting *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1054 (Ind.App. 1990)).

The Seventh Circuit Court of Appeals, in *Insolia v. Philip Morris Incorp.,* 216 F.3d 596 (7th Cir.2000), has taken the holdings reached in these cases one step further by explicitly stating that "there is a considerable difference between knowing that smoking is bad and knowing that smoking is addictive." *Insolia,* 216 F.3d at 603. Thus, the *Insolia* court did not consider whether or not the existence of a distinction between the general risks of smoking and the risk of addiction was a question of fact to be determined by a jury; rather, the *Insolia* court unequivocally recognized that such a distinction does, in fact, exist. The issue, however, in *Insolia,* was whether or not the plaintiffs presented sufficient evidence to generate a genuine issue of material fact that the risk of addiction was not commonly known.

In *Insolia,* the plaintiffs appealed the district court's granting summary judgment on their strict liability claim based on the common knowledge doctrine, arguing that although the typical consumer was aware that smoking was bad, he or she didn't know back then that smoking was addictive. *Id.* at 601. The *Insolia* court affirmed the district court's decision, stating that the evidence in the record "that the ordinary consumer at the time the plaintiffs began smoking was unaware of smoking's addictive danger [was] surprisingly thin." *Id.* at 603. The *Insolia* court also emphasized the plaintiffs' concession that the ordinary consumer at the time in question knew that smoking was habit forming, which the *Insolia* court concluded was tantamount to plaintiffs conceding that the ordinary consumer at the time in question knew that smoking was addictive. *Id.*

The court rejected plaintiffs attempt to distinguish between a habit that can easily be broken and a physiological addiction that is difficult to stop, stating that whether smoking is habit forming or addictive is a "semantical distinction beyond the grasp of our Average Joe." *Id.* Therefore, the *Insolia* court affirmed the district court's granting summary judgment to defendant because of plaintiffs' concession and the "surprisingly thin" amount of evidence plaintiffs presented that tobacco's addictive nature was generally unknown. Significantly, the Seventh Circuit Court of Appeals in *Insolia* stated with clarity that its ruling was limited to the facts in the record before it, stating:

Based on this particular evidentiary record, no reasonable trier of fact could find for the plaintiffs that the ordinary consumer in 1935 and in the early 1950's did not appreciate the health risks of smoking. This decision does not foreclose the possibility that other plaintiffs might prevail on a strict liability claim against the tobacco industry. Another record in another case might be different. Another plaintiff might marshal better evidence that the haze of the tobacco companies' propaganda obscured whatever hazards were known to the average consumer. We explicitly reject the tobacco industry's invitation to declare that cigarettes are not unreasonably dangerous.

*Id.; See also Guilbeault,* 84 F.Supp.2d 263 at 275 n. 2 (taking judicial notice that the general disease related health risks associated with smoking were part of the common knowledge as of 1964, however, noting in *dicta* that in the face of a claim that the plaintiff alleged that he was addicted to defendant's cigarettes, the "common knowledge" analysis might be different).

Most recently, moreover, the Sixth Circuit Court of Appeals handed down two decisions that stress the distinction between common knowledge of the general health hazards of smoking versus common knowledge of specific illnesses or injuries allegedly caused by the defendants' tobacco products. In *Tompkin v. American*

*Brands,* 219 F.3d 566 (6th Cir.2000), the Sixth Circuit Court of Appeals reversed the district court's grant of summary judgment in favor of the defendant tobacco companies, holding that whether the dangers of smoking, namely the link between smoking and lung cancer, were common knowledge between 1950 and 1965 presented a question of fact for the jury. *Tompkin,* 219 F.3d at 572. In reaching this decision, the *Tompkin* court expressly noted:

> The pertinent issue here is not whether the public knew that smoking was hazardous to health at some undifferentiated level, but whether it knew of the specific linkages between smoking and lung cancer.

*Tompkin,* 219 at 572. Thus, because the plaintiffs in *Tompkin* alleged that defendants' tobacco products caused Mr. Tompkin's lung cancer, the Sixth Circuit Court of Appeals concluded that the common knowledge inquiry must be narrowed to the question of whether the link between cigarette smoking and lung cancer was common knowledge, not merely whether the link between cigarette smoking and general health maladies was common knowledge. The *Tompkin* court explained its reason for narrowing the inquiry, stating:

> It is one thing to be aware generally that a product might have an attenuated and theoretical connection with a deadly disease like lung cancer; it is another altogether to comprehend that it is the cause of an overwhelming majority of lung cancer cases. The "common knowledge" requirement is emasculated if a defendant may show merely that the public was aware that a product presented health risks at some vague, unspecified, and undifferentiated level.

*Tompkin,* 219 F.3d at 572.

Additionally, in *Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 2000 WL 1229061 (6th Cir. Aug.31, 2000), the Sixth Circuit Court of Appeals reiterated with approval the analysis employed in *Tompkin,* namely narrowing the question regarding common knowledge. *Glassner,* 223 F.3d 343, 351. In *Glassner,* however, the Sixth Circuit Court of Appeals affirmed the district court's dismissal of plaintiff's wrongful death action against the defendant tobacco companies for failure to state a claim upon which relief might be granted pursuant to FED.R.CIV.P. 12(b)(6). The difference being that the plaintiff in *Glassner* failed to allege any specific illness or injury caused by defendants' tobacco products, whereas the plaintiff in *Tompkin* alleged that the defendants' tobacco products caused his lung cancer. Indeed, the plaintiff in *Glassner* merely alleged that smoking cigarettes is hazardous to one's health and that his wife, the decedent, was harmed as a result of smoking. In so doing, the *Glassner* court limited its common knowledge inquiry to the question of whether the link between cigarette smoking and general health risks was common knowledge during the relevant time period. As a result, the *Glassner* court found that, indeed, there existed widespread public awareness of the health risks associated with smoking, which the *Glassner* court imputed to the decedent, thereby presuming that she was aware and assumed those risks.

In this case, defendants argue that this court should not recognize this distinction, because defendants assert that the risk of addiction is a "lesser included risk" of the risks of smoking. Defendants attempt to marshal case-law in support of their claim that the risks of smoking, and the "lessor included risk" of addiction, have been common knowledge. *See e.g. Allgood,* 80 F.3d at 172; *Sanchez,* 187 F.3d at 490; *Arnold v. R.J. Reynolds Tobacco Co.,* 956 F.Supp. 110, 115 n. 8 (D.R.I.1997);[7] *Lonkowski v. R.J. Reynolds Tobacco Co.,* 1996 WL

---

**7.** In *Arnold,* the district court in Rhode Island stated that "the dangers of smoking and the addictive nature of nicotine have become common knowledge in today's society." *Arnold,* 956 F.Supp. at 115 n. 8. This statement, however, does not stand for the proposition that the risk of addiction is a lesser included risk of the risks of smoking. Indeed, the fact that the district court expressly articulated the

888182 (W.D.La.1996).[8] Despite defendants' protestations, these cases, as will be discussed, do not hold for such a sweeping proposition.

Defendants correctly state that the Fifth Circuit Court of Appeals in *Allgood* affirmed the trial court's dismissal of product liability claims brought by a deceased smoker's spouse. Defendants assert that by explaining that "like the dangers of alcohol consumption, the dangers of cigarette smoking have long been known to the community" with knowledge that the plaintiff claimed that her husband started smoking as early as 1936 and "was so addicted that no amount of warning could induce him to quit," *Id.* at 172, the *Allgood* court implicitly refused to distinguish between the risk of addiction and the risks of smoking. In so doing, defendants, by way of inference, contend that the *Allgood* court held that the risk of addiction was subsumed within the risks of smoking when it concluded that "the dangers of cigarette smoking have long been known to the community." *Id.* at 172. This court, however, points out that the *Allgood* court did not inquire into the extent of knowledge regarding the link between smoking and addiction, nor did it specify the nature of the risk the public allegedly knew. It merely made a bald finding that people believe that smoking has health hazards. Indeed, this court concludes that, such a bare finding is an insufficient predicate for concluding as a matter of law that the nexus between cigarette smoking and addiction was common knowledge. Furthermore, because the Fifth Circuit Court of Appeals in *Allgood* did not expressly hold that the risk of addiction was subsumed within the risks of smoking, the *Allgood* court did not pass on whether or not such a distinction existed. *See Castano v. The American Tobacco Co.,* 961 F.Supp. 953, 958 n. 7 (E.D.La.1997) (stating that the *Allgood* opinion does not hold that nicotine's alleged addictiveness or the defendants' alleged concealment and manipulation was within the "common knowledge").

In *Sanchez v. Liggett & Myers, Inc.,* 187 F.3d 486 (5th Cir.1999), the Fifth Circuit Court of Appeals did refuse to make such a distinction and determination between "common knowledge as to general health dangers" and "common knowledge as to the specific danger of addiction from smoking." *Sanchez,* 187 F.3d 486 at 490. The reason for the Court's refusal, however, was based upon a state statute. Indeed, the *Sanchez* court concluded that the plain language of the state statute and its legislative history established that the Texas legislature did not intend to distinguish between general health dangers and the addictive dangers of smoking when assessing "common knowledge."[9] *Id.* at 490.

■ Based on the foregoing authority, this court concludes that there is a considerable difference between knowing that smoking is bad and knowing that smoking is addictive. *See Insolia,* 216 F.3d at 603. Therefore, this court rejects defendants' argument, and concludes that the risk of addiction is not, as defendants assert, "a lesser included risk," of the risks of smoking.

### e. Will the court take judicial notice that the risks of smoking are "common knowledge?"

Defendants assert that both the Eighth Circuit Court of Appeals and the Iowa

dangers of smoking and the addictive nature of nicotine indicate to this court that, such a distinction between the dangers of smoking and addiction does, in fact, exist.

8. In *Lonkowski,* the district court held that "[a]lthough a precise finding of when the dangers of cigarettes become common knowledge is beyond the scope of this ruling, the court notes that as early as 1952, prior to the start of Mr. Londkowski's smoking, knowledge of the dangers of cigarettes was widespread." *Id.,* 1996 WL 888182 at *7. Thus, the court did not pass upon whether or not there is a distinction between the risks of smoking and the risk of addiction.

9. *See supra* note 6 for a more detailed discussion of the *Sanchez* decision.

Supreme Court recognize that judicial notice can be taken of commonly known facts. Defendants ask that this court take judicial notice that the health risks of smoking, including addiction, are commonly known in Iowa. Defendants assert that many courts in other jurisdictions, cited above, have taken judicial notice of the fact that the health risks of smoking, including addiction, are common knowledge.

Plaintiffs, however, argue that taking judicial notice that the health hazards of smoking were common knowledge in the Northern District of Iowa since the 1950's through the present is improper because there exists considerable dispute devoted to the issues of what information was known among the scientists during this period, what information was known to the tobacco companies, what public statements and actions were being undertaken by the tobacco companies through this period to create false controversy as to those issues, and what the public actually knew or understood during this time. Also, plaintiffs stress that it is improper for this court to take judicial notice of a fact merely because a different court took judicial notice of that same fact.

█ Pursuant to Rule 201 of the Federal Rules of Evidence, a federal court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either:

(1) generally known within the territorial jurisdiction of the trial court or

(2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

FED.R.EVID. 201(b); *See Qualley v. Clo-Tex Int'l, Inc.*, 212 F.3d 1123, 1128 (8th Cir.2000) (stating that Rule 201 governs only the judicial notice of "adjudicative facts." FED.R.EVID. 201(a)); *see also* FED. R.EVID. 201(b) Advisory Committee's Note ("With respect to judicial notice of adjudicative facts, the tradition has been one of caution in requiring that the matter be beyond reasonable controversy;" "A high degree of indisputability is an essential prerequisite."); *General Electric Capital*

*Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir.1997) ("In order for a fact to be judicially noticed, indisputability is a prerequisite.") (citation omitted). Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b). *See* FED.R.EVID. 201(b) Advisory Committee Notes; *International Star Class Yacht Ass'n v. Tommy Hilfiger USA, Inc.*, 146 F.3d 66, 70 (2d Cir.1998) (noting that "[c]are must be taken that the requisite notoriety exists [and][e]very reasonable doubt upon the subject should be resolved promptly in the negative") (quoting *Brown v. Piper*, 91 U.S. 37, 43, 23 L.Ed. 200 (1875)).

This court is familiar with Rule 201 of the Federal Rules of Civil Procedure and its application, having taken judicial notice of various adjudicative facts. *See Laird v. Stilwill*, 969 F.Supp. 1167, 1175 (N.D.Iowa 1997) (taking judicial notice of the five-step process both parties advanced in their memorandums to provide the background necessary to adequately explain the issues at hand to the uninitiated reader); *Commercial Savings Bank v. Commercial Federal Bank*, 939 F.Supp. 674, 677 (N.D.Iowa 1996) (taking judicial notice of the fact that the cities of Carroll, Dedham, and Lanesborro are all located in Carroll County, Iowa); *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1238 (N.D.Iowa 1995) (taking judicial notice of the fact that, at the time Youngblade entered into the Agreement with Curtis 1000, the property on which Gateway 2000 is now located was outside the corporate limits of the town of North Sioux City, South Dakota).

█ In this case, however, the court will refrain from taking judicial notice that the risks of cigarette smoking have been common knowledge to consumers since Mr. Wright began smoking in 1954. Additionally, because this court agrees with the Seventh Circuit Court of Appeals in *Inso-*

*lia* that "there is a considerable difference between knowing that smoking is bad and knowing that smoking is addictive," *Insolia*, 216 F.3d at 603, this court will likewise refrain from taking judicial notice that the risk of addiction has been common knowledge to consumers since Mr. Wright began smoking in 1954. These issues involve questions of fact. To extend the doctrine of judicial notice to the length pressed by the defendants would allow defendants to do through argument to this court what it is required by due process to do at the trial. Such an extension would turn the doctrine of judicial notice into a pretext for dispensing with a trial. *Ohio Bell Telephone Co. v. Public Utilities Comm.*, 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937) ("To extend the doctrine of judicial notice to the length pressed by the respondent would require us to allow the prosecution to do through argument to this Court what it is required by due process to do at the trial, and would be to turn the doctrine into a pretext for dispensing with a trial."). Although the court is cognizant that courts in different jurisdictions have taken judicial notice that the risks of smoking, sometimes including the risk of addiction, are common knowledge, this court cannot take judicial notice of the findings of other courts. *See Holloway v. A.L. Lockhart*, 813 F.2d 874, 878–79 (8th Cir.1987) (holding district court could not take judicial notice of finding of another court that use of tear gas was reasonable and necessary). Also, the simple fact that courts disagree about whether or not to take judicial notice of this fact further illustrates to this court that this fact is subject to considerable dispute, such that taking judicial notice of it would be improper. Moreover, taking judicial notice of the fact that the risks of smoking, including addiction, are common knowledge based in large part on journals, periodicals and the like, has none of the *indicia* of trustworthiness found in a public record or a well-established treatise. *General Electric Corp.*, 128 F.3d at 1084 (stating that Gray's anatomy is an example of a well-established treatise); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1126 (3rd Cir.1993) (refusing to take notice of government test on vehicle rollovers because results are not "readily provable through a source whose accuracy cannot be reasonably questioned"); *Cofield v. Alabama Pub. Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir.1991) (holding that a statement of fact that appears in a daily newspaper does not of itself establish that the stated fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned") (citing FED. R.EVID. 201(b)(2)).

■ As this is a motion to dismiss, the court must assume that all the facts alleged in Mr. Wright's complaint are true, and must liberally construe those allegations in the light most favorable to Mr. Wright. *See St. Croix*, 178 F.3d at 519 ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon*, 168 F.3d at 1113 (same); *Midwestern Machinery, Inc.*, 167 F.3d at 441 (same). Mr. Wright alleges that he did not, in the exercise of ordinary diligence, know of the likelihood of, or the severity of, the risks from defendants' tobacco products, including the risk of addiction. Among other things, Mr. Wright alleges in his design defect claim based on negligence that defendants failed to test, to test adequately, or conduct scientific research on their tobacco products for harmful or addictive properties; failed to establish a reasonably safe dose for foreseeable users; failed to design a product that when used as intended was reasonably safe for foreseeable users; failed to make such feasible improvements in design and composition of their tobacco products such as to materially decrease the foreseeable risk to users; and in designing "light" cigarettes in such a way that they generate lower tar and nicotine ratings on standard machine smoking tests than regular cigarettes while typically they do not actually deliver less tar or

nicotine as actually smoked by most cigarette smokers. Mr. Wright also alleges that defendants controlled and manipulated the amount of nicotine in cigarettes for the purpose and with the intent of creating and sustaining addiction. Furthermore, in his design defect claim based on strict liability, Mr. Wright alleges, among other things, that the tobacco products were addictive, habituating, habit-forming, and once used caused physical and psychological dependence; the tobacco products failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the consumer; that the risk of danger from the design of defendants' tobacco products outweighed the benefits obtained with the use of the products; that the defendants' tobacco products were insufficient in reducing tar and other carcinogens by removal, dilution and filtration; that defendants' tobacco products excessively delivered nicotine; and that defendants controlled and manipulated the amount of nicotine in cigarettes for the purpose and with the intent of creating and sustaining addiction. All of these allegations are at war with the claim that consumers knew they were buying a dangerous product. Without factual development, the court cannot conclude that dismissal based on the common knowledge doctrine is appropriate. Therefore, the court denies defendants' motion to dismiss plaintiffs' strict liability and negligent design defect claims based on the common knowledge doctrine. In so doing, plaintiffs' Objection to and Motion to Strike Defendants' Exhibits and Alternative Motion for Leave to File Response and Supplemental Exhibits (# 62) is **denied** as moot.

Furthermore, this court noted that defendants' previous argument—that the risk-utility test is not applicable to Mr. Wright's design defect claims because the test does not apply to products whose potential risks are well-known such as cigarettes—presupposed that this court would take judicial notice that the risks associated with smoking, including addiction, are common knowledge. Because this court will refrain from taking judicial notice that the risks associated with smoking, including addiction, are common knowledge at this preliminary motion to dismiss stage, application of the risk-utility test, in addition to the consumer contemplation test, to Mr. Wright's negligent and strict liability design defect claims is appropriate.

### 2. Failure to warn claims

In *Olson v. Prosoco, Inc.*, 522 N.W.2d 284 (Iowa 1994), the Iowa Supreme Court stated that any distinction between strict liability and negligence principles on a failure to warn claim are illusory. *Id.* at 288. Thus, under Iowa law, Mr. Wright's strict liability failure to warn claim merges into his negligent failure to warn claim. *Id.* at 289. In determining whether a manufacturer owes a duty to warn, Iowa courts apply the principles of the Restatement (Second) of Torts § 388. *See West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 209 (Iowa 1972). Section 388 provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388 (§ 394 makes § 388 applicable to manufacturers).

In testing the defendants' liability for negligence in failing to warn, the defendants should be held to the standard of care of an expert in its field. *Id.* at 289 (citing *West,* 197 N.W.2d at 210 and *Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775, 782 (R.I.1988)). Therefore, the relevant inquiry is whether the reasonable manufacturer knew or should have known of the danger, in light of the generally recognized and prevailing best scientific knowledge, yet failed to provide warning to users or consumers. *Prosoco,* 522 N.W.2d at 290 (citations omitted). However, a manufacturer of a product has no duty to warn where the risks are known and obvious. *See Sandry v. John Deere Co.,* 452 N.W.2d 616, 619 (Iowa App.1989) ("Where risks are known and obvious there is no need for a warning," citing *Nichols v. Westfield Indus., Ltd.,* 380 N.W.2d 392, 400–01 (Iowa 1985)).

Defendants contend that because the risks of smoking have long been commonly known, they had no duty to warn of such risks. Defendants argue that given the warnings printed on each package of cigarettes since 1966, and the common knowledge that smoking can be hazardous, they had no duty to warn of such risks. Conversely, plaintiffs contend that the risks from smoking are not an obvious danger or within the contemplation of the ordinary consumer. Indeed, in their complaint, plaintiffs allege that Mr. Wright and the general public did not know and understand the dangers presented by smoking.

The court concludes that although defendants properly state the rule that a manufacturer cannot be held liable for obvious or commonly known dangers, dismissal based on the common knowledge that smoking is dangerous is inappropriate. Because this court previously refrained from taking judicial notice that the health risks of smoking are commonly known, whether the health risks of smoking, including the risk of addiction, in terms of a duty to warn, and whether Mr. Wright appreciated the danger sufficiently to obviate defendants' liability, are ques-

tions of fact for the jury. In his complaint, Mr. Wright alleges that he had no knowledge of the risks associated with smoking, including addiction, thus creating a jury question as to whether the danger was open and obvious or part of the common knowledge and whether a warning was required. Moreover, as this court explained in *Rowson v. Kawasaki Heavy Indus., Ltd.,* 866 F.Supp. 1221 (N.D.Iowa 1994), even if Mr. Wright knew or may have known of the risks of smoking, including addiction, created by the use of defendants' tobacco products, it is for the jury to say whether Mr. Wright appreciated these risks sufficiently to obviate the necessity of the warning. *Id.* at 1242 (citing *Bandstra v. Int'l Harvester Co.,* 367 N.W.2d 282, 287 (Iowa App.1985)). Therefore, defendants' motion to dismiss Mr. Wright's failure to warn claim based on the common knowledge doctrine is also denied.

### B. Express Warranty, Fraudulent Misrepresentation and Fraudulent Nondisclosure Claims

Defendants assert that because of the common knowledge doctrine, Mr. Wright cannot allege justifiable reliance, and, consequently, Mr. Wright's fraud and express warranty claims are barred as matter of law.

### 1. Does the common knowledge doctrine bar Mr. Wright's fraudulent misrepresentation and fraudulent nondisclosure claims?

The required elements of fraudulent misrepresentation under Iowa law are: (1) a material (2) false (3) representation coupled with (4) scienter and (5) intent to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party. *Doe v. Hartz,* 52 F.Supp.2d 1027, 1055 (N.D.Iowa 1999) (internal quotations and citations omitted); *accord In re Marriage of Cutler,* 588 N.W.2d 425, 430 (Iowa 1999) (same elements). Moreover, under Iowa law, [a]

representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can [also] constitute fraud. *Doe,* 52 F.Supp.2d at 1055 (internal quotations and citations omitted). Iowa courts have recognized that "[a] misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact in the transaction." *Id.* (citing *Clark v. McDaniel,* 546 N.W.2d 590, 592 (Iowa 1996)) (in a case involving fraudulent concealment in the sale of a car, the court stated, "for concealment to be actionable, the representation must relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances," and "[a] misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact in the transaction") (citations and internal quotations omitted). Thus, fraudulent nondisclosure and fraudulent concealment have the following elements: [10]

1. Special circumstances existed which gave rise to a duty of disclosure between the plaintiff and the defendant. (Describe the relationship found to give rise to a duty of disclosure.)

2. While such relationship existed, the defendant [was aware of the following facts] [intended the following course of action] (state the facts or intent alleged to have been withheld).

3. While such relationship existed, the defendant concealed or failed to disclose [the knowledge or intent alleged to have been withheld].

4. The undisclosed information was material to the transaction.

5. The defendant knowingly failed to make the disclosure.

6. The defendant intended to deceive the plaintiff by withholding such information.

7. The plaintiff acted in reliance upon the defendant's failure to disclose and was justified in such reliance.

8. The failure to disclose was a proximate cause of the plaintiff's damage.

9. The nature and extent of the plaintiff's damage.

Iowa Civil Jury Instructions, 810.2; *see also Jones Distrib. Co.,* 943 F.Supp. at 1473; *Cutler,* 588 N.W.2d at 430 (defining the elements of fraud as including (1) misrepresentation or failure to disclose when under a legal duty to do so, (2) materiality, (3) scienter, (4) intent to deceive, (5) justifiable reliance, and (6) resulting injury or damage). The plaintiff must prove the elements of fraudulent misrepresentation or fraudulent concealment by clear and convincing evidence. *Cutler,* 588 N.W.2d at 430. As the Iowa Supreme Court has observed,

> [F]or concealment to be actionable, the representation must "relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." *Sinnard [v. Roach],* 414 N.W.2d [100,] 105 [ (Iowa 1987) ] (quoting *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975)).

*Clark,* 546 N.W.2d at 592; *McGough v. Gabus,* 526 N.W.2d 328, 331 (Iowa 1995) (fraud may arise from a special relationship giving rise to a duty to disclose and failure to make that disclosure). Iowa cases have not provided a specific test for determining when a duty to reveal arises in fraud cases. *See Clark,* 546 N.W.2d at

---

**10.** Under Iowa law, fraudulent nondisclosure and fraudulent concealment are the same. Therefore, for purposes of this motion to dismiss, the court will refer to fraudulent nondisclosure and fraudulent concealment interchangeably.

592 (citing *Sinnard,* 414 N.W.2d at 106); *Arthur v. Brick,* 565 N.W.2d 623, 625 (Iowa Ct.App.1997). However, Iowa courts have recognized that "[a] misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact in the transaction." *See Clark,* 546 N.W.2d at 592 (*quoting Kunkle Water & Elec., Inc. v. City of Prescott,* 347 N.W.2d 648, 653 (Iowa 1984)); *Arthur,* 565 N.W.2d at 625 (*quoting Clark*); see also Gouge, 586 N.W.2d at 714 (*quoting Arthur*).

Both misrepresentation and fraudulent nondisclosure require reliance that is justified. The Iowa Supreme Court explained that:

> Reliance is justified when a reasonably careful person would be justified in relying on the information supplied. Reliance is not justified if the person receiving the information knows or in the exercise of ordinary care should know that the information is false.

*Pollmann v. Belle Plaine Livestock Auction, Inc.,* 567 N.W.2d 405, 410 (Iowa 1997). A plaintiff cannot recover if he "blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Lockard v. Carson,* 287 N.W.2d 871, 878 (Iowa 1980); *accord* Restatement (Second) of Torts § 541 cmt. a (1977). Nevertheless, Iowa courts have refused to impose an objective standard of ordinary care on plaintiffs in fraud actions, stating:

> that the test for determining whether a party to a transaction has a right to rely on representations of the other is not whether a reasonably prudent person would be justified in relying on such representations but rather, whether the complaining party, in view of his own information and intelligence, had a right to rely on the representations. This subjective standard depends not on what an ordinarily prudent person reasonably would do to protect his or her interests, but upon what the complaining party reasonably could be expected to do.

*Id.* at 877.

According to defendants, because the risks associated with cigarette smoking are common knowledge and have been communicated to smokers through package warnings and advertisements since 1966 and 1972, as matter of law, Mr. Wright cannot show justifiable reliance on any alleged statements or nondisclosures of defendants. The court does not agree.

As indicated previously, the court refuses, at this early stage in the proceedings, to take judicial notice of the fact that the risks associated with smoking, including addiction, are common knowledge. Even if this court did take judicial notice of this fact, it does not mean that Mr. Wright may not have been defrauded by defendants' alleged statements denying their conduct in manipulating the level of nicotine in cigarettes and by their attempts to refute the common knowledge of the harm of cigarettes by representing to the public that nicotine and cigarettes are not addictive.

Under Iowa law, justifiable reliance is a subjective rather than an objective inquiry and because this is a motion to dismiss, Mr. Wright's allegations must be viewed as true and in the light most favorable to him. *See Gross,* 186 F.3d at 1090 (accepting all the factual allegations of the complaint as true and construing them in the light most favorable to the non-movant). Mr. Wright maintains that he did not in the exercise of ordinary diligence know of the likelihood of, or the severity of, the risks from defendants' tobacco products. The Wrights have alleged that the tobacco companies conspired and engaged in a half of century to misrepresent the dangerous health effects of their products, to conceal that their products are addictive, to manipulate the level of nicotine, to ensure the addictiveness of their products, and to misrepresent the level of scientific knowledge about these qualities in their cigarettes. The Wrights further allege that the tobac-

co companies have produced light cigarettes and represented that they supply lower tar and nicotine allegedly knowing full well that smokers still received the same amount of nicotine as in regular cigarettes. Based on these allegations, and the court's refusal to take judicial notice that the risks of smoking are common knowledge, it is conceivable that Mr. Wright would have relied upon defendants' alleged representations designed to convince the public that cigarettes are not harmful or addictive. Therefore, the court denies the defendants' motion to dismiss plaintiffs' fraudulent misrepresentation and fraudulent nondisclosure claims based on the common knowledge doctrine.

### 2. Does the common knowledge doctrine bar Mr. Wright's express warranty claim?

Defendants also claim that Mr. Wright cannot allege justifiable reliance because the risks of smoking are commonly known, and, therefore, his express warranty claim fails as a matter of law.

Under Iowa law, an express warranty may be created by any affirmation of fact or promise made by a seller which relates to the goods. Iowa Code § 554.2313(1)(a). Iowa Code § 554.2313(1)(a) provides that an express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Further, § 554.2313(1)(a) states that the express warranty must serve as part of the "basis of the bargain." [11] The language creating an express warranty need not contain special phrases or formal words such as guarantee or warranty. Iowa Code § 554.2313(1)(b). In fact, a seller need not have intended that the language create an express warranty. Iowa Code § 554.2313(2). Every statement made by a seller, however, does not create an express warranty. Moreover, "affirmations relating merely to the seller's opinion or commendation of goods do not create a warranty." *Falcon Equip. Corp. v. Courtesy Lincoln Mercury, Inc.*, 536 F.2d 806, 809 (8th Cir.1976) (applying Iowa law).

■■■ As indicated previously, because the court will not take judicial notice that the risks of smoking, including addiction, were common knowledge, the court also denies defendants' motion to dismiss plaintiffs' express warranty claims based on the common knowledge doctrine.

### C. Federal Preemption

■■■ In the alternative, defendants argue that plaintiffs' post–1969 fraudulent nondisclosure claims, and failure to warn claims are preempted by the Federal Cigarette Labeling and Advertising Act of 1965, as amended by the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§ 1331–1340. Initially, this court notes that there is a presumption that the historic police powers of the states are not to be superceded by a federal act unless that is the "clear and manifest" purpose of Congress. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The presumption is

---

11. Iowa Code § 554.2313 states in full that:

> 1. Express warranties by the seller are created as follows:
> a. Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> b. Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> c. Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
> 2. It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

especially strong where, as here, preemption would displace the power of a state to protect the health and safety of its citizenry. *Id.* at 518, 112 S.Ct. 2608.

In July 1965, Congress enacted the Federal Cigarette Labeling and Advertising Act. 15 U.S.C. § § 1331–1340. The 1965 Act mandated warnings on cigarette packages (§ 5(a)), but barred the requirement of such warnings in cigarette advertising (§ 5(b)). § 1333–1334. Section 2 of the 1965 Act declares the statute's two purposes: (1) adequately informing the public that cigarette smoking may be hazardous to health, and (2) protecting the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations.[12] In furtherance of the first purpose, § 4 of the 1965 Act made it unlawful to sell or distribute any cigarettes in the United States unless the package bore a conspicuous label providing: "Caution: Cigarette Smoking May Be Hazardous to Your Health." In furtherance of the second purpose, § 5, entitled "Preemption," provided in relevant part:

"(a) No statement relating to smoking and health, other than the statement required by section 4 of the Act, shall be required on any cigarette package.

(b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act."

15 U.S.C. § 1334.

Thereafter, Congress enacted the Public Health Cigarette Smoking Act of 1969 ("the Labeling Act"), which amended the 1965 Act in the following ways. First, the Labeling Act strengthened the warning label, in part by requiring a statement that cigarette smoking "is dangerous" rather than it may be "hazardous." *See* 15 U.S.C. § 1333 (1969). Second, the Labeling Act banned cigarette advertising in "any medium of electronic communication subject to [FCC] jurisdiction." Third, and related, the Labeling Act modified the preemption provision by replacing the original § 5(b) with a provision that reads:

(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

15 U.S.C. § 1334.

In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Supreme Court addressed, in a plurality opinion, preemption under the Labeling Act with respect to a number of state law claims against manufacturers of cigarettes. Parts I through IV of Justice Stevens's opinion represent the opinion of the Court, but parts V and VI of his opinion were joined by only three other Justices. Justice Stevens's opinion as a whole, however, is ultimately supported by a majority of the Court. In parts V and VI of the opinion, the plurality stated that some state law claims based on the common law were preempted by the Labeling Act and some were not. *Id.* at 523–24,

**12.** "It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

"(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and

"(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health."

15 U.S.C. § 1331 (1982 ed.); *See also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 1308–09, 146 L.Ed.2d 121 (2000) (stating that the Labeling Act created a "comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health," and was explicitly designed to ensure that "the public was adequately informed that cigarette smoking may be hazardous to health.").

112 S.Ct. 2608. Justices Scalia and Thomas would have held that all state law claims were preempted by the 1969 Act. *Id.* at 544, 112 S.Ct. 2608 (Scalia, J., concurring in part and dissenting in part). Conversely, Justices Blackmun, Kennedy and Souter, would have limited the preemptive effect of the Labeling Act to positive enactments only and not preempted any common law actions. *Id.* at 531, 112 S.Ct. 2608 (Blackmun, J., concurring in part and dissenting in part). Therefore, Justice Stevens's position that some common law claims are preempted and some common law claims are not preempted can find support from a majority of the Court at any given point.

*Cipollone* clearly stated that positive enactments by a state with respect to cigarette promoting and advertising are preempted by the Labeling Act. The question is to what extent state damage actions founded upon the common law are preempted. In *Cipollone*, the plurality held that the Labeling Act expressly preempts certain state law damage actions, including some actions based on the common law:

> The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules.

505 U.S. at 521, 112 S.Ct. 2608. The plurality also held that the obligation to pay damages is premised upon common law duties, and those duties impose requirements and prohibitions that may be preempted by the Labeling Act. *Id.*

*Cipollone* rejected the notion that the descriptive label a plaintiff attaches to a particular claim determines whether it is preempted. "Nor does the statute indicate that any familiar subdivision of common law claims is or is not preempted." *Id.* at 523, 112 S.Ct. 2608. Rather, preemption analysis applies the following test:

> The central inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common law damages action constitutes a "requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion," giving that clause a fair but narrow reading.

*Id.* at 523–24, 112 S.Ct. 2608 (ellipses in original). The Court then scrutinized the predicate legal duty imposed by each of the claims before it to determine which were preempted. *Id.*

The claims held to be preempted were broad in scope. The plurality held that any common law failure to warn action is preempted to the extent that is relies on a state law requirement or prohibition with respect to advertising or promotion. *Id.* In other words, "insofar as claims under either failure to warn theory require a showing that respondents' post–1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are preempted." *Id.* The Court also held that claims that the tobacco companies neutralized the effect of the federally mandated warnings through their advertising and promotional activities were preempted. *Id.* at 527, 112 S.Ct. 2608. Thus, each of the *Cipollone* plaintiff's claims, grounded in whole or in part upon any alleged inadequacy of the federally mandated warnings, was held to be preempted.

While many claims were held to be preempted, the Court also held that some claims were not preempted. These non-preempted claims included: (1) claims based on a "contractual commitment voluntarily undertaken" and therefore not "regarded as a 'requirement . . . imposed under State Law' " (i.e., breach of express warranty). *Id.* at 524, 112 S.Ct. 2608.(2) Fraudulent misrepresentation claims based on allegedly false statements of material fact. In other words, "claims . . . not predicated on a duty 'based on smoking and health' but rather a more general obligation—the duty not to deceive" (fraud by intentional misstatement). *Id.* at 529, 112 S.Ct. 2608.(3) Claims based exclusive-

ly on actions unrelated to advertising or promotion—i.e., "claims that rely solely on ... testing or research practices...." *Id.* at 524–25, 112 S.Ct. 2608. Finally, (4) claims that rely on a state law duty to disclose information through "channels of communication other than advertising or promotion"—e.g., a state law that obligated tobacco companies to disclose material facts about smoking and health to a state administrative agency. *Id.* at 528, 112 S.Ct. 2608.

### 1. Does the Labeling Act preempt Mr. Wright's post–1969 fraudulent nondisclosure and failure to warn claims?

As indicated previously, the question of whether or not Mr. Wright's claims are preempted turns on "whether the legal duty that is the predicate of the common law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion.'" *Cipollone*, 505 U.S. at 523–24, 112 S.Ct. 2608. Thus, the court must determine whether or not the nature of Mr. Wright's claims fall within this test.

### a. Fraudulent nondisclosure claim

Plaintiffs have alleged that defendants are liable for fraudulent nondisclosure. This claim is based on the defendants' alleged concealment of information pertaining to the addictive nature of nicotine, the level of nicotine used in their tobacco products, and the health hazards associated with smoking cigarettes. Plaintiffs argue the *Cipollone* decision squarely addressed the issue of whether fraudulent nondisclosure claims are preempted by the Labeling Act, and assert that fraudulent nondisclosure claims, whether they are based on affirmative representations or on concealment, and even if they concern advertising and promotion, are not preempted. Plaintiffs argue that their fraud claims are not preempted because such claims are predicated not on a duty based on smoking and health, but rather on a more general obligation, the duty not to deceive, which falls squarely within one of the exceptions to preemption carved out in *Cipollone*.

In *Cipollone*, the plaintiff alleged two theories of fraudulent misrepresentation. Plaintiff's first theory alleged that the cigarette manufacturers, through their advertising, neutralized the effect of federally mandated warning labels. Such a claim was predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking. The *Cipollone* court held this fraud claim was preempted by the Labeling Act, because it was inextricably linked to the plaintiff's failure to warn theory. *Cipollone*, 505 U.S. at 527–28, 112 S.Ct. 2608. However, the *Cipollone* court found that the plaintiff's second fraudulent misrepresentation theory, which alleged false representation and concealment of material facts, was not preempted insofar as those allegations relied on a state law duty to disclose material facts through channels other than advertising and promotion. *Id.* at 528, 112 S.Ct. 2608. Moreover, the *Cipollone* court held that fraud claims based in deceptive advertising also are not preempted because "such claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608.

Therefore, this court finds that Wright's post–1969 claim of fraud based upon concealment is preempted to the extent that it is predicated on a duty to issue additional or clearer warnings through advertising and promotion. However, the court finds that Mr. Wright's post–1969 claim that defendants concealed material facts is not preempted insofar as the claim relies on a state-law duty to disclose such facts through channels of communication other than advertising or promotion. *Id.* at 528, 112 S.Ct. 2608. Based on the pleadings in this case, plaintiffs may have trouble prevailing on this claim, however,

defendants' argument that this claim is preempted by the Labeling Act fails.

Although the court does not understand defendants to be arguing that the Labeling Act preempts plaintiffs' fraudulent misrepresentation claims, which are based on al-legations that defendants included false statements in their advertising and promotional materials, assuming defendants did make this argument, preemption would not apply to these claims because, as indicated previously, the Supreme Court clearly stated that "such claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive," *id.* at 528–29, 112 S.Ct. 2608, and that the Labeling Act "does not encompass the more general duty not to make fraudulent statements." *Id.* at 529, 112 S.Ct. 2608.

### b. Failure to warn claim

Plaintiffs argue that their failure to warn claim is not preempted by the Labeling Act because they do not claim that the warnings in defendants' advertising and promotions were inadequate; rather, plaintiffs argue that the warnings on cigarette packages were inadequate.[13] Specifically, plaintiffs argue that, following *Cipollone's* interpretation of § 5(a) of the Labeling Act, which deals with the required warnings on cigarette packages, plaintiffs are not preempted from bringing a state tort action for money damages with regard to cigarette packaging and labeling. Plaintiffs contend that the *Cipollone* court held that the 1965 version of § 5(a) preempted only affirmative legislative acts by state legislatures or agencies which would require additional warning labels on cigarette packages, and does not preempt state tort actions based on inadequate warnings. According to plaintiffs' argument, because § 5(a) was not modified by the 1969 Act, the preemptive scope of § 5(a) remains the same, which plaintiffs contend is limited. In essence,

therefore, by focusing on the warnings on defendants' cigarette packages, instead of focusing on the warnings in defendants' advertisements and promotions, plaintiffs argue that they effectively circumvent *Cipollone's* preemption holding. The court, however, is not so convinced.

Although plaintiffs' allegations are couched in terms of the packaging of the cigarettes and not the advertising and promotion, the allegations are nonetheless predicated primarily on the theory that the products are unreasonably dangerous because the warnings on cigarette packages are inadequate. Such a claim, in this court's opinion, would have the effect of requiring defendants to include additional cautionary statements on cigarette packages, a requirement that is prohibited by § 5(b) of the Labeling Act. *See Glassner*, 223 F.3d 343, 348 ("To the extent that Glassner [the plaintiff] alleges failure-to-warn claims based upon some duty owed by Defendants to issue additional or more clearly stated warnings on cigarette packages, his OPLA [Ohio Product Liability Act] claims are preempted"); *see also Little v. Brown & Williamson Tobacco Corp.*, 1999 U.S.Dist. LEXIS 21630, at * 25 (D.S.C. March 3, 1999) (stating that plaintiffs' claims that would impose a duty to provide further warnings on cigarette packages are preempted); *LaBelle v. Brown & Williamson Tobacco Corp.*, No. 2:98 3235–23, 1999 U.S.Dist. LEXIS 21629, at *15 (D.S.C. March 18, 1999) (stating that requiring defendant tobacco companies to include cautionary statements on cigarette labels and packages is flatly prohibited by § 5 of the Labeling Act).

Furthermore, the court points out that the Labeling Act states as one of its purposes that interstate commerce "not (be) impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any rela-

---

**13.** Plaintiffs refer to a 1997 law review article in support of their argument that package-based failure to warn claims are not preempted by the Labeling Act. *See* Michael D. Green,

*Cipollone Revisited: A Not So Little Secret About the Scope of Cigarette Preemption,* 82 IOWA L.REV. 1257 (1997).

tionship between smoking and health." 15 U.S.C. § 1331. The court finds that permitting a package based failure to warn claim based on inadequate warnings would conflict with the statutory purpose of national uniformity for cigarette packaging.[14] Therefore, the court concludes that plaintiffs' post–1969 package based failure to warn claim is preempted.

### D. Manufacturing defect claim

Defendants assert that Mr. Wright's negligent manufacturing defect claims should be dismissed because the allegations in the complaint do not support a claim for relief. Defendants argue that Mr. Wright has not alleged that he suffered harm from using cigarettes that were not in the condition intended by the manufacturing defendants. Based on his allegations, defendants contend that the negligent manufacturing defect theory is inapplicable to these allegations and to further buttress their argument, defendants rely on *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 551 (D.Md.1997) (dismissing negligent manufacturing defect claim because it failed adequately to identify the defect), and *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 621–22 (Minn.1984) (manufacturing defect measured by objectively comparing the allegedly defective product to a flawless product). Conversely, plaintiffs contend that defendants are jumping the gun because they argue that at this motion to dismiss stage, they are in no way confined to any particular theory.

▆▆▆ In *Schmedding v. Tnemec Co., Inc.*, 187 F.3d 862 (8th Cir.1999), the Eighth Circuit Court of Appeals stated that all that is required of a complaint is "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 864 (citing FED.R.CIV.P. 8(a)); *see also Bramlet v. Wilson*, 495 F.2d

714, 716 (8th Cir.1974); FED.R.CIV.P. 8(a). Furthermore, the complaint is to be liberally construed in the light most favorable to the plaintiff. *See Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir.1994). A court must assume that all the facts alleged in the complaint are true. *See id.* A Rule 12(b)(6) motion to dismiss a complaint should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him to relief. *See id.* Nor should a complaint be dismissed merely because it does not state with precision all elements that give rise to a legal basis for recovery. *See Bramlet*, 495 F.2d at 716. Thus, as a practical matter, a dismissal under Rule 12(b)(6) should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief. *See id.*

▆▆▆ Here, Mr. Wright has alleged, *inter alia*, in support of his negligent manufacturing defect claim that the defendants negligently breached one or more of their duties in the following ways:

1. failing to test, to test adequately, or conduct scientific research on their tobacco products for harmful or addictive properties, and in failing to establish a reasonably safe dosage for foreseeable users; ¶ 5.4.6

2. in designing, manufacturing, and selling a product that when used as intended was not reasonably safe for foreseeable users; ¶ 5.4.7

3. in failing to make such feasible improvements in design, composition, or manufacture of their tobacco products such as to materially decrease the foreseeable risk to users. ¶ 5.4.8

Because it does not appear beyond a doubt that Mr. Wright can prove no set of facts which would entitle him to relief based on

---

**14.** In his article, Green takes issue with this point, arguing that the *Cipollone* court found that the 1965 Labeling Act did not preempt warnings claims despite the existence of this statement of purpose. This, however, is undoubtedly the reason that Congress amended the 1965 Labeling Act with the broader language contained in the 1969 version of the Labeling Act that extended § 5(b)'s preemptive reach. *Cipollone*, 505 U.S. at 522, 112 S.Ct. 2608.

these allegations, as well as other allegations in the complaint, the court denies defendants' motion to dismiss his negligent manufacturing claim for failure to state a claim on which relief can be granted.

### E. Claim for Breach of Implied or Express Warranties

#### 1. Implied warranty of merchantability

■ Iowa Code § 554.2314 governs warranties of merchantability. Section 554.2314 2(c) states that, to be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." *Id.* Under this theory, a plaintiff is required to prove (1) a merchant sold the goods; (2) the goods were not "merchantable" at the time of the sale; (3) injury or damage occurred to the plaintiff's person or property; (4) the defective nature of the goods caused the damage "proximately and in fact"; and (5) notice was given to the seller of the injury. *See Van Wyk v. Norden Laboratories, Inc.,* 345 N.W.2d 81, 87 (Iowa 1984).

Defendants assert that Mr. Wright's implied warranty of merchantability claim should be dismissed because the authorities cited by defendants demonstrate that, absent a manufacturing defect, cigarettes do not breach the implied warranty of merchantability. Conversely, plaintiffs assert that defendants' contention should be rejected by this court. Plaintiffs argue that they are not limited to proving their implied warranty of merchantability claim by showing that the defendants' cigarettes were defective; rather, plaintiffs contend that the cigarettes were unmerchantable because they were not accompanied by adequate warnings of the health hazards associated with smoking. The court does not agree.

■ As indicated previously, the Labeling Act preempts plaintiffs' post–1969 failure to warn claims. Accordingly,

plaintiffs' implied warranty of merchantability claim is preempted to the extent it alleges failure to provide additional warnings after 1969, and is therefore dismissed. However, Mr. Wright's breach of an implied warranty claim survives to the extent that it is based on specific allegations that defendants knowingly designed, manufactured and distributed a product which they knew was both carcinogenic and addictive and, thus, not fit for the ordinary purpose for which it was intended. *See Magnus v. Fortune Brands, Inc.,* 41 F.Supp.2d 217, 224 (E.D.N.Y.1999). Additionally, plaintiffs' allegations that the manipulative enhancement of the nicotine level in tobacco in order to induce addiction could possibly prove that the product was defective and, thus, not fit for the ordinary purpose for which it was intended. *See Castano,* 870 F.Supp. 1425 at 1434. (holding that the implied warranty claims were not based on smoking and health, or on the advertising and promotion of cigarettes; rather, the claims were based upon a duty "not to manufacture and sell cigarettes that contain addictive nicotine, the levels of which have been purposefully manipulated in order to induce or maintain the plaintiffs' addiction."). Therefore, defendants' motion to dismiss Mr. Wright's implied warranty of merchantability claim for failure to state a claim upon which relief can be granted, because of the alleged defective condition of cigarettes, is denied.

#### 2. Express warranty claim

Defendants assert that Mr. Wright's allegations that defendants' advertising and promotional statements relating to addiction, tar and nicotine level in cigarettes, smoking, and health created express warranties, fail as a matter of law to state an express warranty claim. Specifically, defendants contend that Mr. Wright has failed to identify sufficiently the nature, extent, and language of any alleged representations and how he relied on them.[15]

---

**15.** Defendants also contend that in light of the common knowledge of the risks of cigarette smoking, they had not duty to provide Mr. Wright with any additional information. This argument is unavailing as this court has previously refused to take judicial notice of the fact that the risks of smoking are common knowledge. The court reiterates that taking

██ The court discussed in further detail Mr. Wright's allegations and the requirements for an express warranty claim under Iowa law in the preceding section, captioned B 2. It must be remembered that this is a motion to dismiss, which is premised on the pleadings. As such, plaintiffs are not required to produce any explicit statements or affirmations regarding smoking, particularly when no discovery has been conducted. In his complaint, Mr. Wright alleges that:

> Defendants sold tobacco products and warranted through their advertisements and promotional statements that their products were not addictive, that they did not intend to addict Mr. Wright, that the tar and nicotine levels in their products were at non-addictive levels, and that there were no adverse health effects arising from the use of their products. ¶ 8.1

> As a result of defendants' warranties and in reliance thereon, Mr. Wright purchased and used defendants' tobacco products. ¶ 8.2

> The defendants' tobacco products did not conform to the foregoing express warranties in that defendants manipulated levels in the tobacco products, the tobacco products were addictive and the products caused Mr. Wright to suffer adverse health effects. ¶ 8.3

Thus, the court finds that Mr. Wright has sufficiently plead an express warranty claim in accordance with Rule 8(a)(2) of the Federal Rule of Civil Procedure. *See* FED.R.CIV.P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

### 3. Does Mr. Wright's failure to notify defendants of the alleged breach of warranty preclude his warranty claims?

Defendants assert that because Mr. Wright has not alleged in his complaint that he provided notice of any defect to any defendant or agent of the defendant, Mr. Wright's warranty claims should be dismissed. Plaintiffs concede that they did not give notice to the defendants, however, they contend that the notice requirement should not preclude their warranty claims. First, plaintiffs assert that Mr. Wright purchased the cigarettes from a retailer, and therefore, because he never purchased cigarettes directly from the defendants, application of the notice requirement between a buyer and seller is inapplicable. Second, plaintiffs argue that because other courts have held that the Uniform Commercial Code's ("UCC") notice provision is inapplicable to products liability cases, so too should this court in this case. Plaintiffs argue in the alternative, that if Mr. Wright was required to give notice to defendants, that notice should not be required here because they assert that notifying defendants about Mr. Wright's injuries and warranty claims would only serve to tell the defendants what they already know—that the cigarettes that they manufacture are hazardous. Thus, plaintiffs appear to be asserting that the defendants were on "constructive notice" of the alleged defects in their cigarettes in light of the vast amount of litigation. Lastly, plaintiffs argue that notice of their warranty claims was provided in the form of this lawsuit.

██ The UCC notice requirement that defendants assert bars Mr. Wright's warranty claims in Iowa is codified at Iowa Code § 554.2607(3)(a). § 554.2607(3)(a) provides in pertinent part:

> When the buyer has accepted a tender of goods, the buyer must notify the seller of any breach of warranty within a reasonable time or be barred from any remedy.

*Id.* The Iowa Supreme Court has held that "the giving of a notice must be pleaded as a condition precedent to recovery." *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905,

judicial notice as to whether or not the risks of smoking are common knowledge would be

improper at this motion to dismiss stage.

909 (Iowa App.1982) (citing *Winter v. Honeggers' & Co.*, 215 N.W.2d 316, 327 (Iowa 1974)). Moreover, under Iowa law, "ordinarily this notice must be more than a mere complaint." *Dailey v. Holiday Distributing Corp.*, 260 Iowa 859, 151 N.W.2d 477, 487 (Iowa 1967).

Here, defendants argue that because § 554.2607(3)(a) expressly required timely notice as a condition precedent for recovery of breach of warranty and because Mr. Wright did not give notice to defendants, his warranty claims should be dismissed. Although defendants correctly state the requirements of this notice provision, this court does not find that it is applicable here. This is so, because the defendants are not sellers within the meaning of this notice provision. Indeed, § 554.2103 defines seller as "a person who sells or contracts to sell goods." Because defendants never sold cigarettes to Mr. Wright or contracted to sell cigarettes to Mr. Wright, the notice provision of § 554.2607(3)(a) was never triggered. In so doing, § 554.2607(3)(a) never imposed a duty on Mr. Wright to notify defendants of his warranty claims.

In *McKnelly v. Sperry Corp.*, 642 F.2d 1101 (8th Cir.1981) (applying Iowa law), the Eighth Circuit Court of Appeals addressed whether or not the plaintiff's failure to give the defendant notice of the breach of express warranty until filing suit barred the plaintiff from any remedy. *Id.* at 1107. The defendant argued that it did, citing Iowa Code § 554.2607(3)(a) (1967) and *Winter v. Honeggers' & Co., Inc.*, 215 N.W.2d 316 (Iowa 1974). The *McKnelly* court thought otherwise, explaining:

> [W]e are not persuaded the Iowa Supreme Court would, under all the circumstances here, hold the notice provision of the Uniform Commercial Code applicable to McKnelly's suit. By its terms Section 554.2607(3)(a) applies only to a buyer who has accepted tender of goods from a seller. *It does not expressly apply as between an injured third person other than the buyer and a manufacturer instead of a seller.*

*Id.* at 1107 (emphasis added). Thus, in interpreting § 554.2607(3)(a), the Eighth Circuit Court of Appeals stated that the notice provision of § 554.2607(3)(a) was not applicable to third persons, and was likewise not applicable to manufacturers; rather, § 554.2607(3)(a) is only applicable to a buyer and seller. In light of the Eighth Circuit's interpretation of § 554.2607(3)(a), and the definition of a "seller," this court concludes that Mr. Wright's warranty claims are not barred because § 554.2607(3)(a) is not applicable here. Because the court finds that § 554.2607(3)(a) is not applicable, the court need not address plaintiffs' other arguments in support of their contention that failure to notify defendants about the alleged breach should not bar their warranty claims. Nevertheless, even if the Iowa Supreme Court were to conclude that section § 554.2607(3)(a) is applicable in such a case as this, this court finds that such notice was given in the form of plaintiffs' lawsuit.

As far as defendants' argument that they will be prejudiced if Mr. Wright is permitted to circumvent the notice provisions, the court is not persuaded. First, the court points out that Mr. Wright is not circumventing UCC notice provisions because § 554.2607(3)(a) is not applicable. Second, defendants fail to elucidate in what capacity they are prejudiced. In fact, based on the defendants' thoroughly written and researched briefs, coupled with their strong oral arguments, it is clear to this court that the defendants were not prejudiced by the lack of notice of the alleged breach of warranty claims in this case. Therefore, defendants' motion to dismiss Mr. Wright's warranty claims for failure to notify of the alleged breach is denied.

### F. Claim for Breach of Special Assumed Duty

Plaintiffs incorrectly state that Restatement (Second) of Torts § 323, captioned "Negligent Performance of Under-

taking to Render Services," has not been adopted in Iowa.[16] Indeed, in *American State Bank v. Enabnit,* 471 N.W.2d 829 (Iowa 1991), the Iowa Supreme Court stated "[w]e have applied Restatement section 323, or cited it with approval, a number of times." *Id.* at 832 (citing *DeBurkarte v. Louvar,* 393 N.W.2d 131, 135, 140–41 (Iowa 1986); *Van Iperen v. Van Bramer,* 392 N.W.2d 480, 485 (Iowa 1986); *Wilson v. Nepstad,* 282 N.W.2d 664, 673 n. 1 (Iowa 1979)). Thus, Restatement (Second) of Torts § 323 is cognizable in Iowa. Restatement (Second) of Torts § 323 (1965) provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.*

Mr. Wright alleges, *inter alia,* in his complaint that defendants' breached their duty and responsibility to report research regarding smoking and health regarding their tobacco products through their public pronouncements, suppressed unfavorable research data, and perpetuated a false "controversy" regarding the human health consequences of smoking, and that this breach caused Mr. Wright to become addicted to tobacco products and to suffer adverse health effects arising from the use of cigarettes, thus causing Mr. Wright to incur damages.

■ On the other hand, defendants argue that the above alleged actions do not amount to voluntary assumption of duty, emphasizing that a legal duty is a question of law appropriately decided by the court on a motion to dismiss. *See, e.g. J.A.H. v. Wadle & Associates, P.C.,* 589 N.W.2d 256, 258 (Iowa 1999). A legal duty "is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons." *Sankey v. Richenberger,* 456 N.W.2d 206, 209 (Iowa 1990). "Whether, under a given set of facts, such a duty exists is a question of law." *Leonard v. State,* 491 N.W.2d 508, 509 (Iowa 1992). In deciding whether a legal duty exists in this case, three factors govern the analysis: (1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations. *Id.* at 509–12. These factors are used under a balancing approach and not as three distinct and necessary elements. *Id.* at 512. In the end, whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm. *Larsen v. United Fed. Sav. & Loan Ass'n,* 300 N.W.2d 281, 285 (Iowa 1981).

---

16. Plaintiffs assert that despite the inapplicability of § 323 they still state a claim for relief because Restatement (Second) of Torts § 324A, which has been adopted by the Iowa Supreme Court, is closely related to § 323. § 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The rule stated in this section parallels the one stated in § 323, as to the liability of the actor to the one to whom he has undertaken to render services. This section, however, deals with liability to third persons.

The court agrees with plaintiffs' assertion that dismissal of this claim would be premature, and that they should be afforded the opportunity to establish whether defendants owed plaintiffs a special duty through discovery. The court reiterates that because this is a motion to dismiss, the court must take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences in the light most favorable to plaintiffs. *See St. Croix*, 178 F.3d at 519 ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."). Consequently, defendants' motion to dismiss Mr. Wright's breach of special assumed duty is denied.

Moreover, to the extent that defendants argue that plaintiffs' post–1969 duty to disclose claim that "defendants voluntarily assumed the duty to report honestly and competently on all research regarding smoking and health regarding their tobacco products through their public announcement," ¶ 9.2, is preempted, the court does not agree. If it is established that defendants "voluntarily undertook this duty to disclose" such claim would not be preempted as it would fall squarely within one of the exceptions articulated by *Cipollone*, because the predicate duty is imposed not by the State but by the party assuming the obligation. *Id* at 524 ("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement … imposed under State law' within the meaning of [Federal Cigarette Labeling and Advertising Act] § 5(b).").

### G. Fraud Claims

Defendants correctly point out that Mr. Wright's fraud claim is subject to the heightened pleading requirements of Rule 9(b). This court has articulated the elements of fraud under Iowa law and the standards for pleading fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure in several recent decisions. *See Doe v. Hartz*, 52 F.Supp.2d 1027, 1055 (N.D.Iowa 1999) (elements and pleading); *Brown v. North Cent. F.S., Inc.*, 987 F.Supp. 1150, 1155–57 (N.D.Iowa 1997) (pleading); *Brown v. North Cent. F.S., Inc.*, 173 F.R.D. 658, 664–65 (N.D.Iowa 1997) (pleading); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812 (elements); *North Cent. F.S., Inc. v. Brown*, 951 F.Supp. 1383, 1407–08 (N.D.Iowa 1996) (pleading); *Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F.Supp. 1445, 1469 (N.D.Iowa 1996) (elements of fraud and fraudulent non-disclosure); *DeWit v. Firstar Corp.*, 879 F.Supp. 947, 970 (N.D.Iowa 1995) (elements and pleading). Thus, only a brief discussion of these matters is required here.

Rule 9(b) of the Federal Rules of Civil Procedure " 'requires a plaintiff to allege with particularity the facts constituting the fraud.' " *See Brown*, 987 F.Supp. at 1155 (quoting *Independent Business Forms v. A–M Graphics*, 127 F.3d 698, 703 n. 2 (8th Cir.1997)). " 'When pleading fraud, a plaintiff cannot simply make conclusory allegations.' " *Id.* (quoting *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir.1997)). In *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639 (8th Cir.1995), the Eighth Circuit Court of Appeals explained:

> Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." " 'Circumstances' include such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir.1985), conclusory allegations

that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule. *In re Flight Transp. Corp. Sec. Litig.*, 593 F.Supp. 612, 620 (D.Minn.1984).

*Commercial Property*, 61 F.3d at 644; *see Roberts*, 128 F.3d at 651 (noting that factors a court should examine in determining whether the "circumstances" constituting fraud are stated with particularity under Rule 9(b) "include the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud.").

Defendants assert that Mr. Wright's allegations of fraudulent misrepresentation and fraudulent nondisclosure fall short of satisfying Rule 9(b), because defendants contend that Mr. Wright has failed to identify the speakers or the time and place of the alleged fraudulent statements necessary to comply with Rule 9(b).[17] Plaintiffs disagree. Plaintiffs contend that, when viewed as a whole, their petition does meet the pleading requirements of Rule 9(b). In other words, plaintiffs virtually concede that the allegations contained in the complaint under the captioned headings for fraudulent misrepresentation and fraudulent nondisclosure are not pleaded with the particularity required by Rule 9(b), however, plaintiffs argue that the allegations set forth in the complaint under the captioned heading, civil conspiracy, do specify the alleged fraudulent statements, identify the speaker, state where and when the statements were made and explain why the statements were fraudulent. Although the court agrees that the allegations under the civil conspiracy claim do provide more specificity, the court is still not convinced that the pleadings satisfy the heightened pleading requirement for fraudulent misrepresentation and fraudulent nondisclosure pursuant to Rule 9(b).

### 1. Mr. Wright's fraudulent misrepresentation claim

 Mr. Wright alleges that defendants, through advertising in the mass media and by other communications, repeatedly made representations that nicotine was not addictive, that cigarette smoking was not a proven cause of disease, and that they did not manipulate nicotine levels in tobacco products so as to addict consumers. ¶ 10.2. Also, Mr. Wright alleges that defendants have fraudulently represented that "light" cigarettes deliver less tar and nicotine. *Id.* Mr. Wright alleges that he relied on these misrepresentations to his detriment, including addiction to tobacco products and suffering adverse health effects. Based on the pleadings, the court concludes that Mr. Wright's fraudulent misrepresentation allegations fail to satisfy the pleading with particularity requirement of Rule 9(b) even when read in concert with his claim of civil conspiracy for the following reasons.

First, as noted by the defendants, Mr. Wright does not specifically identify the speakers of the various statements that he alleges were fraudulent; rather, he collectively alleges the following: The following persons and parties participated in a civil conspiracy . . . :

R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; The American Tobacco Company; American Brands, Inc.; Brown & Williamson Tobacco Corporation; B.A.T. Industries, P.L.C.; Batus Holdings, Inc.; British American Tobacco, Ltd.; British–American (Holdings) Ltd.; Philip Morris Incorporated (Philip Morris U.S.A.); Philip Morris Companies, Inc.; Liggett & Myers, Inc.; Liggett Group, Inc.; the Brooke· Group, Limited; Lorillard Tobacco Company; Lorillard Incorporated; Loews Corporation, United States Tobacco Company; and United States, Inc. Brown and Wil-

---

**17.** Because the court previously articulated the elements for fraudulent misrepresentation and fraudulent nondisclosure in the section B1, a reprisal of these elements here is unnecessary.

liamson Tobacco Company, successor by merger to American Tobacco Company; Brown and Williamson Tobacco Company; The Tobacco Institute, Inc., Council for Tobacco Research—USA, Inc., f/k/a The Tobacco Industry Research Committee, Hill and Knowlton, Inc. Plaintiffs' complaint at 12.2.1. Significantly, of the eighteen (18) tobacco companies that plaintiffs identify, several were never defendants in this action, and two, namely R.J.R. Nabisco, Inc. and Philip Morris Companies, have been dismissed by this court pursuant to a joint and stipulated motion to dismiss. As this court explained in *DeWit v. Firstar Corp.*, 879 F.Supp. 947 (N.D.Iowa 1995), where a plaintiffs' complaint "accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud." *DeWit*, 879 F.Supp. at 972. Specifically, examining all twenty-one of the paragraphs (¶ 12.6.1 – ¶ 12.6.21) of plaintiffs' complaint in which plaintiffs allege fraudulent misrepresentation on behalf of defendants, plaintiffs only identify the identity of the speakers in five of the twenty-one paragraphs, namely ¶ 12.6.13, ¶ 12.6.15, ¶ 12.6.17, ¶ 12.6.18 and ¶ 12.6.19. Therefore, because Mr. Wright failed to take care in identifying which of the defendants was responsible for each individual act of fraudulent misrepresentation, such allegations fall short of satisfying the particularity requirement of Rule 9(b). Second, although plaintiffs contend that "several of the paragraphs provide specific times at which the alleged fraudulent statements occurred," and that "most of the paragraphs specify why the statements were fraudulent," this contention is contrary to Rule 9(b), which expressly states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.P. 9(b). In so doing, all of Mr. Wright's averments, as opposed to "several" or "many," must be plead with particularity. The court draws the plaintiffs attention to the following paragraphs, which are deficient in either one or both of these

respects: ¶¶ 12.6.2 – 12.6.7, ¶¶ 12.6.9 – 12.6.10. Moreover, several of the statements that plaintiffs do identify cover far ranging periods, including 1950–1962 (¶ 12.6.11) and 1962–1966 (¶ 12.6.14). Such wide time frames during which misrepresentations were allegedly made fail to provide the specificity required by Rule 9(b). *See Brown*, 173 F.R.D. at 668 (stating that allegations of such wide time frames during which misrepresentations were allegedly made simply do not provide the specificity required under Rule 9(b)). Third, plaintiffs have failed to allege where any of the alleged false statements were published or made available to the general public. For example, plaintiffs refer to "various and sundry publications" and "publications" without identifying any of them. ¶ 12.6.5, ¶ 12.6.6 12 and ¶ 12.6.10 ("various and sundry publications, news releases, telephone calls, contacts with the press, the media, the government ..."). For these reasons, Mr. Wright has failed to plead fraudulent misrepresentation with particularity in accord with Rule 9(b) of the Federal Rules of Civil Procedure.

### 2. Mr. Wright's fraudulent nondisclosure claims

Mr. Wright must also plead his fraudulent nondisclosure claims with the particularity in accord with Rule 9(b) of the Federal Rules of Civil Procedure. *See Roberts v. Francis, M.D.*, 128 F.3d 647, 651 (8th Cir.1997) (analyzing whether or not plaintiff's fraudulent concealment claim was plead with particularity in accord with Rule 9(b)). Mr. Wright's fraudulent nondisclosure claims are no more specific than his fraudulent misrepresentation claims. Mr. Wright generally alleges that the defendants failed to disclose the following material information:

that nicotine is addictive ¶ 11.3.1

that nicotine is highly addictive ¶ 11.3.2

that defendants manipulate nicotine levels in their tobacco products so as to addict consumers ¶ 11.3.3

that smoking cigarettes causes adverse health consequences ¶ 11.3.4

Mr. Wright further alleges the suppression of and refusal to publish, various and sundry research studies carried out by a co-conspirator which revealed that cigarette smoking was harmful and addicting. ¶ 12.6.8. Mr. Wright asserts that defendants were under a duty to disclose the full extent of their research and knowledge concerning the adverse health effects of using their products, because of their superior knowledge regarding cigarette products. The court previously concluded that Mr. Wright has sufficiently plead justifiable reliance [18], however, the court has not passed on whether or not the defendants were under a duty to disclose the alleged information they possessed concerning these allegations outlined above. This is so, because the defendants have not moved to dismiss Mr. Wright's fraudulent nondisclosure claims on a lack of duty argument. Nevertheless, even if the defendants set forth this argument, the court would disagree because the existence of a legal duty can arise from inequality of condition and knowledge. *See Doe*, 52 F.Supp.2d at 1055 (stating that "for concealment to be actionable, the representation must relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances ...") (internal citation omitted); *see also U.S. ex rel. Bussen Quarries, Inc. v. Thomas*, 938 F.2d 831, 834 (8th Cir.1991) (stating that a duty to disclose may arise from inequality of position, a fiduciary relationship between the parties, or a demonstration of superior knowledge on the part of one party that is not within the fair and reasonable reach of the other party) (citation omitted). As far

as whether Mr. Wright has sufficiently plead his fraudulent nondisclosure claims, the court concludes that he has not sufficiently plead the circumstances constituting such alleged fraud, including information relating to the identity, time and place. *See Roberts*, 128 F.3d at 651 (stating that the pleading requirements of Rule 9(b) include circumstances relating to the time, place, and the identity of the person allegedly committing fraud). Without pleading this specific information, therefore, Mr. Wright's fraudulent nondisclosure claims fail to comply with Rule 9(b) of the Federal Rules of Civil Procedure.

█ Rule 15(a) of the Federal Rules of Civil Procedure allows parties to amend pleadings freely before responsive pleadings are filed or otherwise upon leave of court. Because this case was removed to federal court by defendants,[19] and plaintiffs have not yet amended their complaint, they will be given leave to amend the complaint to cure the Rule 9(b) defect. Therefore, for the reasons stated above, defendants' motion to dismiss plaintiffs' fraudulent misrepresentation and fraudulent nondisclosure claims pursuant to Rule 9(b) is denied, and plaintiffs are given leave to amend their complaint to state claims for fraud adequately.

### H. Civil Conspiracy Claim and Loss of Consortium Claim

Defendants assert that because Mr. Wright's fraudulent misrepresentation and fraudulent nondisclosure claims fail as a matter of law, so too does his conspiracy claim. Similarly, defendants assert that Mrs. Wright's consortium claim fails because Mr. Wright's substantive claims fail. Plaintiffs, on the other hand, contend that their conspiracy claim is not contingent on their fraud claims. This is so, because plaintiffs argue that their civil conspiracy

---

**18.** See discussion under heading B1.

**19.** In support of plaintiffs' argument for permission to amend their fraud complaint in accordance with Rule 9(b), they impress upon the court that this case was originally filed in

state court, having been removed by defendants to federal court, and that Iowa's state court standards for pleading fraud are substantially less stringent than those imposed by Rule 9(b).

claim can survive based on their other substantive claims, namely their negligence claim. In the same vein, plaintiffs argue that the loss of consortium claims does not fail as a matter of law.

### 1. Mr. Wright's civil conspiracy claim

■■■■ A recognized aspect of Iowa law is the legal theory of civil liability for conspiracy to commit a wrongful act. *Basic Chems., Inc. v. Benson,* 251 N.W.2d 220, 232–33 (Iowa 1977); *Cora v. Strock,* 441 N.W.2d 392, 394 (Iowa Ct.App.1989). However, the Iowa Supreme Court has repeatedly "recognized that '[c]ivil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy which give rise to the action.'" *Robert's River Rides, Inc. v. Steamboat Dev. Corp.,* 520 N.W.2d 294, 302 (Iowa 1994) (quoting *Basic Chems., Inc.,* 251 N.W.2d at 233, and *Lindaman v. Bode,* 478 N.W.2d 312, 317 (Iowa Ct.App. 1991)). The Iowa Supreme Court explained the nature of civil conspiracy in *Basic Chemicals* as follows:

A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful. It may be proven by substantial evidence.

*Basic Chems., Inc.,* 251 N.W.2d at 232; *accord Cora,* 441 N.W.2d at 394 (quoting *Basic Chemicals* ). To put it another way, civil conspiracy requires "mutual mental action coupled with an intent to commit the act which results in injury." *Basic Chems., Inc.,* 251 N.W.2d at 233. Thus, "[t]he principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against or injury upon another." *Id.; accord Locksley v. Anesthesiologists of Cedar Rapids, P.C.,* 333 N.W.2d 451, 456 (Iowa 1983).

In this case, defendants contend that Mr. Wright's conspiracy claim is inextricably linked with his fraud claims—that is, plaintiffs' conspiracy claim falls if their fraud-based claims fall. Plaintiffs dis-

agree, arguing that even if their fraud claims do not survive, their civil conspiracy claim still survives if any of their other substantive claims survive. Specifically, plaintiffs argue that the underlying tort of the civil conspiracy need not be an intentional tort, and, therefore, plaintiffs argue that the defendant tobacco companies can conspire to commit negligence, stating that "without a doubt people can conspire to act in a careless fashion." For this proposition, plaintiffs rely on *Robbins v. Heritage Acres,* 578 N.W.2d 262 (Iowa Ct.App.1998).

In *Robbins,* the plaintiff had been involuntarily discharged from a nursing home. Plaintiff Robbins set forth a negligence and civil conspiracy claim. Robbins based his civil conspiracy claim on the defendants' decision to "rid" the nursing home and staff of Robbins who allegedly required more attention and work than the staff was willing to perform. *Id.* at 263. Even though Robbins did not set forth an intentional tort as the underlying wrong, the Iowa Court of Appeals reversed the district court's granting of defendants' motion to dismiss, explaining:

Robbins' conspiracy allegations include an agreement to withhold or deprive him of necessary medical or nursing home care. These allegations implicate Heritage's contractual duties to Robbins and the standards of professional care and conduct of the named employees. We cannot say Robbins is unable to sustain a civil conspiracy claim under any state of facts under the petition.

*Id.* at 265. Thus, the wrong contemplated by the *Robbins* court was allegedly based on an agreement to withhold or deprive the plaintiff of necessary medical or nursing home care. The *Robbins* court further stated that the underlying wrong of plaintiff's civil conspiracy claim was based on breach of contract or violation of the standards of professional care. Significantly, however, the *Robbins* court did not hold that the underlying wrong of a civil conspiracy could be predicated on negligence.

■ In so far as the plaintiffs contend that the underlying tort in a civil conspiracy claim may be based on negligence, the court does not agree. Indeed, the court finds this contention to be a paradox. The Supreme Court of Iowa has explained that a "conspiracy involves some mutual action coupled with an intent to commit the act which results in injury." *Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 737 (Iowa 1983) (citing *Basic Chemicals, Inc.*, 251 N.W.2d at 233). Therefore, because conspiracy requires an agreement to commit a wrong, there can hardly be a conspiracy to be negligent—that is, to intend to act negligently.[20] *See Sackman v. Liggett Group, Inc.*, 965 F.Supp. 391, 395 (E.D.N.Y.1997) (stating that for plaintiffs to state a viable cause of action for conspiracy, it must be based on their products liability claim and not on the negligence claim); *Sonnenreich v. Philip Morris Inc.*, 929 F.Supp. 416, 419 (S.D.Fla.1996) (recognizing in the context of a lawsuit against tobacco manufacturers that "[l]ogic and case law dictate that conspiracy to commit negligence is a non sequitur"); *Rogers v. Furlow*, 699 F.Supp. 672, 675 (N.D.Ill. 1988) ("[w]hat the plaintiffs suggest is a conspiracy to commit negligence, a paradox at best"); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 n. 2 (Tex.1995) ("Given the requirement of specific intent, parties cannot engage in a civil conspiracy to be negligent.").

Furthermore, *Robbins* is not to the contrary. While the *Robbins* court held that the underlying wrong on which plaintiff's civil conspiracy claim was based was breach of contract or violation of the standards of professional care, the *Robbins* court did not hold that the underlying wrong of a civil conspiracy could be predi-cated on negligence. Simply because the plaintiff in *Robbins* only set forth two claims, civil conspiracy and negligence, does not mean that, in permitting the civil conspiracy claim to survive, the *Robbins* court held that the underlying wrong was based on negligence. Indeed, the *Robbins* court clearly stated that the plaintiff's conspiracy allegations "include an agreement to withhold or deprive him of necessary medical or nursing care." *Robbins*, 578 N.W.2d at 265. Thus, the underlying wrong in *Robbins* for the civil conspiracy claim was not negligence, as plaintiffs contend; rather it was breach of contract or violation of the standards of professional care.

■ Notwithstanding, it must be remembered that Mr. Wright also alleges, *inter alia*, that the defendants manufacture cigarettes, acting in concert or individually with knowledge and ratification, in such a way as to control and manipulate the nicotine content in such cigarettes, with the purpose of securing acceptance, habituation, and addiction. *See* ¶ 12.6.21. Indeed, this claim appears to be grounded in Mr. Wright's allegation that cigarettes are unreasonably dangerous. Whether Mr. Wright may maintain a cause of action for conspiracy to produce unreasonably dangerous products—as a strict liability tort—under Iowa law is a matter of first impression. At this early stage of the proceeding, the court concludes that Mr. Wright has adequately plead a civil conspiracy claim premised on the allegation that defendants intentionally agreed to produce an unreasonably dangerous product—cigarettes—an underlying wrong for which they could be held strictly liable. *See Basic Chemicals, Inc.*, 251 N.W.2d at

---

20. Iowa Civil Instructions 3500.1, "Essentials for Recovery–Conspiracy," states: In order to recover for the claim of conspiracy, the plaintiff must prove all of the following propositions:

1. (Name of co-conspirator) committed the wrong of (describe the alleged wrong), as defined in Instruction No. ___.

2. The defendant participated in a conspiracy with (name of co-conspirator) to (describe the alleged wrong).

3. The nature and extent of damage.

The Note to this instruction provides: The "wrong" must be a tortious act. *But see Robbins*, 578 N.W.2d at 265 (holding that the plaintiffs stated a claim premised on a conspiracy to breach a contract, which is not a tort).

233; *Ezzone v. Riccardi,* 525 N.W.2d 388, 397–98 (Iowa 1994) (stating that the conspiracy claim is valid only to the extent that another claim is valid and an agreement was made to commit the wrong which forms the basis of the other claim). The court is cognizant that there is a paucity of law on this issue, and that the law involving tobacco litigation is continually evolving. Therefore, the court notes that on a more fully developed record or in light of intervening controlling authority or a comprehensive review of persuasive authority, Mr. Wright's civil conspiracy claim based on an underlying wrong subject to strict liability may not be viable.

For now however, the court concludes that although Mr. Wright cannot state a viable cause of action for conspiracy based on his negligence claim, Mr. Wright can state a viable cause of action for civil conspiracy based on his allegation that defendants intentionally agreed to produce an unreasonably dangerous product—cigarettes—an underlying wrong for which they could be held strictly liable. Accordingly, defendants' motion to dismiss Mr. Wright's civil conspiracy claim is denied. This is true even if Mr. Wright cannot successfully amend his fraud claims in accordance with Rule 9(b) of the Federal Rules of Civil Procedure.

### 2. *Mrs. Wright's loss of consortium claim*

Similarly, Mrs. Wright's consortium claim does not fail as a matter of law, because several of Mr. Wright's substantive claims still exist. Thus, defendants' motion to dismiss Mrs. Wright's loss of consortium claim is denied.

### IV. CONCLUSION

Upon review, the court concludes that the plaintiffs have stated valid claims for the following: negligent manufacturing defect claim, negligent design defect claim, pre–1969 negligent failure to warn claim, strict liability design defect claim, pre–1969 strict liability failure to warn claim, breach of special assumed duty, breach of implied warranty of merchantability, breach of express warranty, civil conspiracy claim and loss of consortium claim. Therefore, defendants' motion to dismiss these claims is denied. The court further concludes that plaintiffs have failed to state a claim for the following: post–1969 negligent package-based failure to warn claim, and post–1969 strict liability package-based failure to warn claim. Therefore, defendants' motion to dismiss these claims is granted. With regard to the fraud claims, plaintiffs are granted leave to amend. Therefore, the court concludes that defendants' Motion to Dismiss is **granted** in part, and **denied** in part.

Furthermore, plaintiffs' Objection to and Motion to Strike Defendants' Exhibits and Alternative Motion for Leave to File Response and Supplemental Exhibits (# 62) is **denied** as moot.

**IT IS SO ORDERED.**